UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

```
-------------------------------------------------------------
                                     )
In Re EpiPen ERISA Litigation        )  COURT FILE
                                     )  NO. 17-CV-1884 (PAM/HB)
-----------------------------------  )
                                     )
Elan Klein, Adam Klein, Susan Illis, )
and all others similarly situated,   )
Amy M. Khan, and F. Emil Jalonen,    )
as Personal Representative of the    )
Estate of Leah Weaver,               )
                                     )
                 Plaintiffs,         )
                                     )
        vs.                          )
                                     )
Prime Therapeutics, LLC; Express     )
Scripts Holding Company; Express     )
Scripts, Inc.; Medco Health          )
Solutions, Inc.; CVS Health          )
Corporation; Caremark, LLC;          )
Caremark Rx, LLC; CaremarkPCS        )
Health, LLC; United HealthCare       )
Services, Inc.; UnitedHealth Group,  )
Inc.; Optum, Inc.; OptumRx Holdings, )
LLC; and OptumRx, Inc.,              )  Courtroom 7D
                                     )  Wednesday, May 1, 2019
                 Defendants.         )  St. Paul, Minnesota
                                     )  2:00 P.M.
-------------------------------------------------------------
```

**CASE MANAGEMENT CONFERENCE**


BEFORE THE HONORABLE HILDY BOWBEER
UNITED STATES MAGISTRATE JUDGE



**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

**A P P E A R A N C E S :**

```
For the Plaintiffs:        KELLER ROHRBACK, LLP
                           By:  GRETCHEN S. OBRIST, ESQUIRE
                                CARI CAMPEN LAUFENBERG, ESQUIRE
                           1201 Third Avenue - Suite 3200
                           Seattle, Washington  98101-3052

                           LOCKRIDGE GRINDAL NAUEN, PLLP
                           By:  KATE BAXTER-KAUF, ESQUIRE
                                DAVID W. ASP, ESQUIRE
                           100 Washington Ave. So - Suite 2200
                           Minneapolis, Minnesota  55401

                           BERMAN TABACCO
                           By:  KATHLEEN M. DONOVAN-MAHER, ESQ.
          ( via phone )         JUSTIN N. SAIF, ESQUIRE
                           One Liberty Square
                           Boston, Massachusetts  02109

For Defendant Prime
  Therapeutics:            DORSEY & WHITNEY, LLP
                           By:  JAIME STILSON, ESQUIRE
                           50 South Sixth Street - Suite 1500
                           Minneapolis, Minnesota  55402-1498

For Defendants Express     SPENCER FANE, LLP
  Scripts and Medco:       By:  DONALD G. HEEMAN, ESQUIRE
                                JESSICA J. NELSON, ESQUIRE
                           100 South Fifth Street - Suite 1900
                           Minneapolis, Minnesota  55402

                           QUINN EMANUEL URQUHART
                             & SULLIVAN, LLP
                           By:  JONATHAN GORDON COOPER, ESQUIRE
                           1300 I Street NW - Suite 900
                           Washington, D.C.  20005

For Defendants CVS and     WILLIAMS & CONNOLLY, LLP
  Caremark:                By:  DANIEL M. DOCKERY, ESQUIRE
                           725 Twelfth Street NW
                           Washington, D.C.  20005

                           FAEGRE BAKER DANIELS, LLP
                           By:  STEVEN L. SEVERSON, ESQUIRE
                                ISAAC B. HALL, ESQUIRE
                           2200 Wells Fargo Center
                           90 South Seventh Street
                           Minneapolis, Minnesota  55402-3901
```

**A P P E A R A N C E S :**   (Continued)


**For Defendants United**          **ALSTON & BIRD, LLP**
**  HealthCare,**                  By:  BRIAN D. BOONE, ESQUIRE
**    UnitedHealth Group**         Bank of America Plaza
**      and Optum:**               101 South Tryon Street - Suite 4000
                                   Charlotte, North Carolina  28280


                                   **ALSTON & BIRD, LLP**
                                   By:  ELIZABETH BROADWAY BROWN, ESQ.
                                   One Atlantic Center
                                   1201 West Peachtree Street
                                   Atlanta, Georgia  30309


                                   **STINSON, LLP**
                                   By: KADEE JO ANDERSON, ESQUIRE
                                   50 South Sixth Street - Suite 2600
                                   Minneapolis, Minnesota  55402




                    *     *     *     *

1              (2:00 p.m.)

2                        **P R O C E E D I N G S**

3                         **IN OPEN COURT**

4              THE COURT:  Good afternoon, everyone.  Please be

5      seated.

6              We are in court this afternoon in the matter of In

7      Re EpiPen ERISA Litigation.  This is proceeding under Matter

8      Number 17-CV-1884, and we're here for our May case

9      management conference.

10             Let me start by getting some appearances.  I'll

11     get appearances in the courtroom first and then we'll check

12     to see if there's anyone on the phone who wishes to have

13     their appearance entered.

14             So first on behalf of the plaintiffs.

15             MS. OBRIST:  Gretchen Obrist of Keller Rohrback

16     for the plaintiffs.

17             MS. LAUFENBERG:  Cari Laufenberg, Keller Rohrback,

18     on behalf of Plaintiffs.

19             MS. DONOVAN-MAHER:  Good afternoon, Your Honor.

20     Kathleen Donovan-Maher of Berman Tabacco for the plaintiffs.

21             MS. BAXTER-KAUF:  Kate Baxter-Kauf, Lockridge

22     Grindal Nauen, for the plaintiffs.

23             MR. ASP:  Good afternoon, Your Honor.  David Asp,

24     Lockridge Grindal Nauen, for the plaintiffs.

25             THE COURT:  Very well.  Good afternoon to all of

 1    you.

 2            And on behalf of the defendants.  Let's start with

 3    Prime.

 4            MS. STILSON:  Good afternoon, Your Honor.  Jaime

 5    Stilson on behalf of Prime Therapeutics.

 6            THE COURT:  And is anyone on the phone here on

 7    behalf of Prime?  Oh, I forgot to ask.

 8            Anybody on the phone who wants an appearance noted

 9    on behalf of Plaintiffs?

10            MR. SAIF:  Good afternoon, Your Honor.  Justin

11    Saif of Berman Tabacco on behalf of the plaintiffs.

12            THE COURT:  All right.  Now, anybody else here on

13    behalf of Prime?

14        (No response)

15            THE COURT:  Okay.  Let's turn to Express Scripts.

16            MR. COOPER:  Good afternoon, Your Honor, Jonathan

17    Cooper from Quinn Emanuel on behalf of the Express Scripts

18    and Medco defendants.

19            MR. HEEMAN:  Good afternoon, Your Honor.  Don

20    Heeman, Spencer Fane, on behalf of the Express Scripts

21    defendants.

22            MS. NELSON:  Good afternoon, Your Honor.  Jessica

23    Nelson, Spencer Fane, on behalf of the Express Scripts

24    defendants.

25            THE COURT:  And on behalf of CVS.

1          MR. DOCKERY:  Good afternoon, Your Honor.  Daniel

2     Dockery, Williams & Connolly, on behalf of the CVS and

3     Caremark defendants.

4          MR. SEVERSON:  Good afternoon, Your Honor.  Steven

5     Severson with Faegre Baker Daniels on behalf of CVS.

6          MR. HALL:  And Isaac Hall from Faegre Baker

7     Daniels on behalf of the CVS defendants.

8          THE COURT:  And on behalf of the United HealthCare

9     defendants.

10          MR. BOONE:  Good afternoon, Your Honor.  Brian

11     Boone from Alston & Bird for the Optum and United entities.

12          MS. ANDERSON:  Kadee Anderson from Stinson on

13     behalf of the Optum and United defendants.

14          MS. BROWN:  Liz Broadway Brown, Alston & Bird, on

15     behalf of the Optum and United defendants.

16          THE COURT:  Is there anyone in the courtroom whose

17     appearance we have not noted and anybody else on the phone

18     who wants to have their appearance noted and hasn't spoken

19     up yet?

20          (No response)

21          THE COURT:  All right.  Well, I think we've got a

22     complete cast of characters then.

23          I've got the agenda that the parties submitted on

24     April 24th at document number 383.  Just a couple of quick

25     housekeeping things, not because they're necessarily more

1      important, but because I want to make sure that we don't

2      forget about them in the rush to get out at the end of the

3      conference.

4              First, you got an email from my courtroom deputy

5      indicating that I'm going to be out of the country the week

6      of June 10th, which is the week that we were going to have

7      our June case management conference, so I was wondering

8      whether counsel had had a chance to consult with their own

9      calendars and then with each other on a date in June that

10     would work best for all of you, and I think Judy threw out

11     some options.

12             Anybody prepared to address that?  Ms. Obrist?

13             MS. OBRIST:  Sure, Your Honor.  We did talk to the

14     defendants and June 19th would work fine.

15             THE COURT:  All right.  Is there a preference for

16     morning or afternoon?

17             MS. OBRIST:  Earlier might be a little better?

18             MR. COOPER:  Well, I think we would prefer the

19     afternoon.  We didn't discuss that aspect of --

20         (Laughter)

21             THE COURT:  So maybe early afternoon?

22             MR. COOPER:  I think that should work.

23             THE COURT:  All right.  I'll take a look at

24     whether there's anything else on my calendar on the 19th

25     that I need to work around, but we'll plan to shoot for an

1    early afternoon setting on the 19th that hopefully will kind

2    of work for everybody, and thank you for your consideration

3    in making that change.

4            Second, you brought to my attention that I had

5    inadvertently -- and I will underscore that -- made a

6    mistake in the Second Amended Scheduling Order which was

7    entered on April 18th.  I had not intended to change your

8    bench trial to a jury trial.  That was just a mistake on my

9    part.

10           Now, I haven't spoken to Judge Magnuson or heard

11   anything from Judge Magnuson about whether he would ever

12   consider an advisory jury, but no such conversation was

13   behind that word change.  It was just a mistake on my part.

14           I thought about coming in and suggesting that it

15   was just my way of checking to make sure you had read it

16   carefully word for word --

17       (Laughter)

18           THE COURT:  -- all the way to the end, but I

19   didn't think I could pull that one off.

20           So as soon as I'm back up in my chambers, we'll be

21   doing an amended amended scheduling order which changes it

22   to the way it was meant, and that is for a trial ready date

23   for a bench trial.

24           So those were the two housekeeping issues I wanted

25   to address.  Why don't we move to the top of the agenda,

1      which is status of discovery, and who's going to address

2      that on behalf of Plaintiffs with respect to the status of

3      Plaintiffs' request to Defendants and their responses?

4              Ms. Obrist.

5              MS. OBRIST:  Good afternoon.

6              Most of our updates are in the letter, so I won't

7      go through all of that.  I just wanted to give you an

8      update, though.  Our letter didn't have an accurate total

9      for documents produced so far because we hadn't loaded them.

10     We just got some recent productions.  So the total so far

11     that Defendants have produced is now at about 129,000

12     documents and that may change later today, so it's a moving

13     number because they're making productions.  About half of

14     those documents are documents that were previously produced

15     in the MDL and the other half are new, responsive in this

16     case.

17             On the search terms, custodians, and ESI sources,

18     I just wanted to update the Court about the search term

19     processes still ongoing with three out of the four

20     defendants.  We've come to an agreement with Optum.  We're

21     still working with CVS and ESI on some fine-tuning.  We're

22     not quite as far along with Prime.

23             And one of the things that we're dealing with

24     during these negotiations is that the defendants have told

25     us that searches are pulling too many documents and they

1   have spot-checked to see if the documents are relevant or

2   not.  They're saying they're not, but our view is that

3   spot-checks aren't really the way to determine that.  There

4   could be -- you know, they could be randomly spot-checking

5   documents that aren't relevant, and that doesn't mean that

6   the rest of them are irrelevant.

7           So the biggest sticking point seems to be, the

8   defendants' position has been, at least specifically with

9   CVS and ESI, that there needs to be EpiPen limiter on all

10  the search strings.  And we do have some ways we can get

11  around this and we've come to an agreement on some terms,

12  but overall there's still an overriding insistence that

13  there be a limiter that relates to EpiPen or the other EAI

14  devices, so the alternative to the EpiPen.  And that is a

15  problem from our perspective, because not every document in

16  this case is going to use the word "EpiPen," not every

17  relevant case in this case will use the word "EpiPen," will

18  not use "AUVI-Q" or "Adrenaclick," which are the

19  competitors.

20          So we are trying to come to an agreement and

21  figure out how we can get documents that don't use those

22  words.  It is plain to us from congressional testimony and

23  other sources and documents we've already seen that not

24  every document that pertains to the practices that we're

25  challenging here will talk about this specific drug, and

1    there are overarching policies and procedures that the

2    defendants use across multiple different drugs that will be

3    relevant to our case, and so the EpiPen limiter is still a

4    problem.  We're trying to get to an agreement, but we're not

5    there yet.

6            And so the consequence of that is that we are now

7    two weeks away from the substantial completion deadline

8    again and it's doubtful that we're going to get substantial

9    completion by May 15th, because we're still working out

10   search terms, and then there's going to be likely a

11   relevancy review on top of that by the defendants once we do

12   come to agreement on search terms.

13           So the substantial completion issue, as the

14   defendants put in their letter, they said they're going to

15   be able to substantially produce by May 15th the production

16   of documents they've already agreed to produce, but that is

17   a pretty -- that is a limited set, and that's exactly what

18   they said for April 1st.  That doesn't include anything

19   expanding the time period, because we are still although

20   getting closer on time period, we haven't worked all those

21   issues out, and then, you know, there's still some other

22   disputes that haven't been worked out, so it's not clear to

23   me what it actually means that they're going to have

24   substantial completion by May 15th of documents they've

25   already agreed to produce, because that's what we thought

1    was going to be happening by April 1st.  So needless to say,

2    there seems to be a lot of documents that will be produced

3    after May 15th.

4              THE COURT:  With respect to the issue of using a

5    limiter of "EpiPen" or kind of surrogates for "EpiPen," as

6    you understand it, is there agreement that, yes, there may

7    be relevant documents that don't use that term, but we just

8    haven't found another -- an effective or efficient way to

9    find those without unlocking the multitudes, or is there not

10   even agreement about whether there exists some substantial

11   number of documents that don't use that term but would still

12   be relevant?

13             MS. OBRIST:  Well, that's unknown to us because we

14   can't see the documents, so we don't know how many documents

15   there may be that are truly relevant and go the heart of the

16   issues in this case that may be missed if we're imposing the

17   EpiPen limiter.

18             THE COURT:  But presumably you've got examples of

19   documents that you contend --

20             MS. OBRIST:  We do.

21             THE COURT:  -- are relevant that don't use those

22   limiters, and so I guess I didn't know if at least as to

23   those examples everybody said, "Yeah, those are relevant.

24   Now what do we do about it?"

25             MS. OBRIST:  Well, I haven't conferred with the

1       defendants to get them, you know, to agree that certain

2       documents are relevant that don't use the "EpiPen" words,

3       but we have been trying to work on the search strings.  I

4       understand that there are words that we had in some of our

5       search strings pull things that are off the wall.  Like, you

6       know, there's words that are used in this context that are

7       used elsewhere that it's just not going to work, and so

8       we've been trying to be practical about that and cutting out

9       things that are going to grab documents that are clearly

10      outside the scope.

11              Nevertheless, there's going to be some documents

12      that we aren't going to get if we have to use an EpiPen or

13      similar limiter for every single search string.  So we are

14      trying to tinker with some of the words and make them

15      closer, you know, instead of within 50, within five or ten,

16      you know, trying to hone in on what the issues really are,

17      but we still haven't got there yet.

18              THE COURT:  Understood.  Are you looking as well

19      at whether potentially a broader search string might be

20      appropriate for a limited slice of documents?

21              MS. OBRIST:  Yes.  So just to give you a little

22      perspective, we have a set of search strings -- there's

23      about 15 search strings that have complex terms on both

24      sides of "within 25" or "and" and those kinds of link words,

25      connectors.  So there's only probably a handful out of that

 1    15 that we were still seeking -- and we never did seek all

 2    of our terms without EpiPen limiters.  We had EpiPen

 3    limiters on a lot of them.  So we had a select few strings

 4    that we wanted not to have those limiters on and those are

 5    the ones that we're fighting about now, because they are --

 6    you know, the defendants are saying things like, "Well, that

 7    brings back a hundred thousand documents.  We've already

 8    produced 130,000 documents, so that's just too many."

 9         I don't believe that a number or a cap is

10    appropriate.  It really matters what -- I mean, there may be

11    that many relevant documents.  So looking at the math

12    doesn't quite work and that's not the only factor that the

13    defendants are considering.  And they are -- you know,

14    they've told us that they've spot-checked these documents

15    and they don't appear to be relevant, but it's very

16    unscientific to spot-check and we have no view into what

17    those documents say.  We haven't been able to spot-check

18    them, so we have no way to test that conclusion the

19    defendants are making.  And, you know, it seems a little bit

20    arbitrary to put a cap on the number of documents that a

21    search term is hitting and only spot-checking it and finding

22    a few irrelevant documents and then throwing the whole

23    string out.

24         So that is the challenge right now is figuring out

25    how to make these search strings more targeted, but not too

1    limited so that we're throwing out documents that we really

2    do need.

3              THE COURT:  Understood.  Understood.

4              MS. OBRIST:  On other disputes that may require

5    court intervention on the plaintiffs' side, we are still

6    working on the time period proposal.  I don't have a lot to

7    report there.  We're getting closer or we're getting very

8    close, but we're not quite there yet.  We're evaluating

9    proposals, we're waiting on CVS, I think, for their

10   counter-proposal, so that is hopefully going to be resolved

11   and that will expand the universe of documents that will be

12   produced, another topic that goes into the substantial

13   completion deadline.

14             On data, Defendants' letter mentions that they

15   aren't aware of any issues with data.  We actually do still

16   have issues with all of the defendants on data.

17             We've received a response, either verbal or

18   written, from some defendants, but not all, but the issue

19   here is basically that we've got data from the MDL case.  We

20   have a few issues with how to make sure that that is what we

21   really need here.

22             One is, we don't have a clear idea of what all of

23   the column headings mean.  You know, we don't have a data

24   dictionary.  Sometimes these are pretty cryptic titles for

25   data fields.  So we're trying to figure out if there is a

1      data dictionary.  Some defendants have told us there is no

2      such thing, it doesn't exist, and so we're trying to figure

3      out a way around that if we truly can't get a data

4      dictionary.

5              And then there is also the separate issue of we

6      don't know what fields were originally requested in the MDL

7      and therefore we don't know if that matches up with our

8      requests, or our RFPs.  So we have asked for a list of all

9      available data fields from the defendants and most have been

10     resistant to providing that for various reasons, and it

11     seems like it's a pretty standard thing to do in litigation

12     to get a list of available fields to see what might be

13     relevant.

14             I realize this may be complicated with interacting

15     data sets and not all the data is from one database, so the

16     defendants have primarily three sets of data that they've

17     all given us.  One is claims data that shows the transaction

18     at the point of sale for a purchase of an EpiPen.  The

19     second would be the rebate data or fee data.  So there's

20     several types of fees.  There are rebates, there are

21     price-protection rebates, there are admin fees.  And then

22     the third one is how much did they keep or pass through to

23     an affiliate, or to a plan, or an insurance company.  And my

24     understanding is that those things all live in separate

25     places.  So it's not as if all of this data is coming from a

1    single database.  So it's not simple.

2         Nevertheless, we do need to have a clear idea of

3    what is available and what are we getting and what do we

4    already have from the MDL, and then are there things that we

5    still need.  And so we're trying to pinpoint certain items

6    that we think we're missing, but we still have difficulty

7    doing that sort of in a vacuum, because we don't know the

8    universe that's available to us that might be helpful that

9    we aren't able to just articulate because we don't know that

10   it exists.

11        So we're working through those issues, but that is

12   taking some time.

13        THE COURT:  Are there separate -- are the requests

14   that are yielding this data, have they been requests for

15   what was produced in the MDL, or had you made requests for

16   data by description and subject matter and in response you

17   got, "Here's what we produced in the MDL"?

18        MS. OBRIST:  Both.  We have a separate RFP for

19   whatever was produced in the MDL, and then we have also

20   separate RFPs for the specific types of data and information

21   that we want.  I don't know off the top of my head if

22   there's any data that wasn't already produced in the MDL.

23   That may well be the case, but for the most part, the big

24   data sets we have are what was produced in the MDL, so it's

25   a combination.

1          THE COURT:  All right.

2          MS. OBRIST:  There's also an issue about data

3     being accessible.

4          So, for example -- I can't remember the year; I

5     think it might be 2014 -- data prior to that point isn't

6     accessible to Prime for certain topics.

7          And for other defendants we've got issues with --

8     you know, we have claims data, but not data on the rebates,

9     or we've got claims and rebates, but we don't have

10    pass-through data.  So it's a different situation for every

11    defendant, so we're trying to line it all up and try and get

12    a consistent data set across all of the defendants to the

13    extent that's even possible and cover the time periods on

14    the big issues, so that continues to be a process that we're

15    discussing.  But we do need to get that wrapped up, because

16    that is something that's holding up other parts of our

17    litigation.

18          THE COURT:  And to the extent it holds up other

19    parts of the litigation, would it be -- would I be correct

20    that then it starts to put your deadline for your class cert

21    motion in danger?

22          MS. OBRIST:  It's possible that that could happen.

23    You know, I think that we aren't going to have to present

24    total numbers on class certification, we'll have to present

25    methodology, but it's going to limit our ability to see the

1    whole picture and that will necessarily impact our approach

2    to class certification.  So that and depositions and, you

3    know, we've got a lot of other things to do between now and

4    the end of the year and I think it's going to be important

5    for us to have really great data sets to the extent we can

6    and, you know, our experts will need to work with that.  So

7    there's a lot of --

8             THE COURT:  Oh.  And I didn't mean to suggest that

9    if it doesn't impact your class cert motion, then, like, why

10   are we even talking about it.  I just wanted to understand

11   potentially what the domino effects could be if we don't get

12   some of these issues sorted out pretty quickly.

13            MS. OBRIST:  Yes.  And also, you know, we --

14   mediation.  To have a picture about what the value of the

15   case is, we need to have accurate data, so that's another

16   reason why we need it.

17            One of the other issues that I mentioned in the

18   letter is in regard to manufacturer payments.  This has been

19   a long discussion with the defendants we're still working

20   through.

21            But in a nutshell, the issue is that the

22   defendants' responses to our discovery requests redefined

23   the term "manufacturer payments," and the way that they

24   limited the term, it is for monies that are specifically

25   tied to the EpiPen or other EAI devices, and this means that

1    the answers they're giving us, particularly in

2    interrogatories, are limited in a way that we didn't intend

3    when we asked the question.

4           And the reason this is important is that not every

5    payment stream from treatment from Mylan to the PBMs is

6    specifically tied to EpiPen utilization or sales.  So, you

7    know, every time you buy an EpiPen there's a part of that

8    purchase that goes from Mylan to the PBM.  That's one way

9    that these payments are made, but it's not the only way.

10   And there are agreements, there are interacting contracts,

11   there are discounts that Mylan might provide in the mail

12   order situation to one of the PBMs that has their own mail

13   order that are taken into account when the PBM is

14   negotiating other rebate and fee agreements that are tied to

15   the EpiPen.  So it's not as if limiting everything to just

16   EpiPen utilization is going to suffice in this case.

17          Now, we have agreed with the defendants that we're

18   not seeking data or information about payments that are

19   specifically linked to other drugs, but we are seeking these

20   other overarching agreements on payments and arrangements

21   between Mylan and the PBMs.  And so we've proposed a way to

22   get around this with one defendant, with ESI, and we, you

23   know, hope that this can solve the problem.  But there is a

24   fundamental disagreement among the parties on this issue,

25   and what I hear from the defendants is, "Well, if you see

1    everything that happened with EpiPen, then you've got the

2    whole story," but that's not the whole story, and we do have

3    evidence in the documents now that other payment streams

4    that don't mention EpiPen either in the contract or in the

5    calculation of the payments, that they exist, so, you know,

6    we may end up having to move to compel on this issue.

7            And then the last thing I wanted to address is our

8    request to third parties.  Mylan, there's no update, really,

9    there.  They've produced their documents and I don't believe

10   there's any follow-up to do.

11           Sanofi produced 225,000 documents recently.

12   Defendants' letter says they're unaware of that production.

13   We've since talked about that.  They are actually aware of

14   it and they were when the letter was filed based on a

15   meet-and-confer that we had.  Perhaps there was a

16   miscommunication, but in any event, we are producing the

17   Sanofi documents.  It's an enormous production.  It's

18   notably twice as large as the total that we've gotten from

19   the defendants in this case, which is another reason why

20   limiting search strings based on the number of documents

21   they're bringing back when we're still under what a third

22   party is producing doesn't make a whole lot of sense to the

23   plaintiffs.  But in any event, we are producing Sanofi's

24   production to the defendants and they should have it early

25   next week.

1          And that is all I have on our section of the

2     agenda.

3          THE COURT:  Great.  Thank you.

4          Who would like to address these issues on behalf

5     of defendant?

6          MR. COOPER:  I will do it, Your Honor.  This is

7     Jonathan Cooper from Quinn Emanuel here on behalf of the

8     Express Scripts defendants.  I will do my best to address

9     these issues for all defendants, though there may be some

10    issues where counsel for those individual other defendants

11    will need to jump in.

12         Starting at the top of the agenda, as we stated in

13    our letter and I've confirmed with the other defense

14    counsel, we do anticipate that we will -- that all the

15    defendants will substantially complete by May 15th

16    production of all the documents we've previously agreed to

17    produce in response to the plaintiffs' first set of RFPs.

18         The one exclusion I would mention for that is as

19    in our letter.  There are certain client materials that the

20    parties are in the process of negotiating a sampling process

21    for.  I know, for example, for Express Scripts we sent a

22    sampling proposal to the plaintiffs sometime last week and

23    are waiting on a response.  This has been a topic of

24    discussion for a few weeks between the parties.  So I think

25    that's the one area where those materials won't get produced

1    by May 15th because we don't yet have an agreement on what

2    that sampling process will be.  But all of the other

3    materials, my understanding, both documents and data, that

4    the parties -- that the defendants have previously agreed to

5    produce in response to the first set of RFPs will be

6    produced by May 15th or substantially produced by May 15th.

7            Moving on to the next agenda item, meet-and-confer

8    status, as counsel for the plaintiffs noted, discussions,

9    meet-and-confers, are still ongoing on with respect to

10   search terms and the time frame.  I know on the search term

11   side, Counsel indicated one of the big holdup points is this

12   issue of EpiPen limiters, and I think that's right generally

13   speaking.  As Ms. Obrist noted, the plaintiffs have asked

14   Defendants to run roughly 15 search strings.  That number

15   actually keeps increasing, but roughly 15 or so, and we've

16   agreed on about ten or so of those and we're still

17   negotiating over the rest.

18           The problem I can tell you from at least Express

19   Scripts' perspective is that the remaining terms not only

20   don't have any limiters, but aren't targeted in anything

21   specific to this case, so they're very, very broad.

22           So the search terms, for example, were -- that

23   Plaintiffs were proposing were generating upwards of 600,000

24   documents to review.  And it's not just the volume, but it

25   is -- the vast -- you can tell on the face of the terms that

1    they're not -- they're going to be pulling in hoards of

2    irrelevant documents and spot-checks have confirmed that as

3    well.

4            Just to give some examples, they have terms such

5    as "credit within 25 of client," and for Express Scripts

6    that was pulling up 78,000 documents just by itself, those

7    two words, and their search strings are many more than two

8    words.  Many of them are multiple dozens of words.  And when

9    you break out all the permutations, it's thousands of

10   different permutations of search terms that they're asking

11   us to run.  So some of these individual ones are very broad

12   and generic, aren't tied to anything specific to this case,

13   so that's why we've been asking either for EpiPen

14   limiters -- that's been our proposal -- or much more

15   targeted terms that -- we leave to them to come up with

16   those because they know what they're looking for, and we

17   haven't yet gotten agreement yet on that final set.

18           THE COURT:  So it sounds like you at least

19   conceptually acknowledge that there may well be documents or

20   some subset of documents that would be appropriately

21   elicited by a search and relevant and responsive that

22   doesn't necessarily include an EpiPen limiter.  But what

23   you're saying is without the EpiPen limiter and without some

24   other focus that you're still trying to arrive at with

25   Plaintiffs, it's just too broad.

1          MR. COOPER:  There could be, Your Honor.  There

2     certainly could be documents that are responsive and

3     relevant that don't have the EpiPen term specifically in

4     them.  The problem is, the terms that the plaintiffs have

5     proposed to date are too broad and generic.

6          You know, Express Scripts, as an example, has tens

7     of thousands of clients.  It does deals with, you know,

8     dozens of manufacturers, and so when you have just a very

9     generic term of "credit within 25 of client," that's going

10    to pull up, you know, tens of thousands of documents just

11    for the agreed-on custodians and time frame, and if we

12    expanded the time frame, it would be even more than that.

13    And that's not going to be hitting on relevant documents, or

14    even if they are, they will be a needle in the haystack, and

15    it, in our view, would be unreasonable to review 78,000

16    documents for those two terms when, you know, a couple maybe

17    are responsive at best.  And so that's what we've been

18    looking for, is to either use EAI limiters, EpiPen limiters,

19    or have the plaintiffs propose some other very targeted

20    search that would enable us to focus on the documents that

21    we believe are responsive.

22          And I would also add that in our view, all of the

23    heartland of the relevant documents here have all already

24    been reviewed and produced, all of the communications with

25    Mylan and Sanofi, you know, the internal Express Scripts --

1    and I believe for the other defendants as well -- the

2    internal documents about formulary status and positioning

3    for EpiPen and related EAI devices, those have all been

4    produced.  The search terms that are left at issue are

5    things at the periphery.  The plaintiffs have been asking

6    for things, you know, that aren't at the core of what

7    they're claiming in their complaint.  So in our view we've

8    already produced what's most relevant in this case, and

9    that's among the 120,000 or so documents that have been

10   produced, or are in the queue to be produced by the May 15th

11   deadline to the extent they haven't already been produced.

12            And just to go quickly through some of the other

13   issues that Ms. Obrist mentioned.

14            On the data, as I mentioned, my understanding is

15   that all of the agreed upon data will be produced by

16   May 15.  I'm not certain for all the other defendants.  I

17   know for Express Scripts we've provided -- she mentioned

18   that some of the data column headers are opaque and we've

19   provided descriptions of all of those.

20            The plaintiffs haven't identified to us any data

21   they believe is missing that we should produce, so we've

22   asked them for that and there hasn't been anything on that

23   front, so we think that all of the data that they're seeking

24   either has or will be produced by the May 15 deadline.

25            On the time period, as Ms. Obrist noted, we're

1   just continuing to meet and confer on that.  I know for

2   Express Scripts we sent a letter to the plaintiffs on

3   April 18th and discussed it previously at a meet-and-confer

4   on April 8th and are still waiting on a response from

5   Plaintiffs on that front as well.

6            And finally, on the issue of manufacturer

7   payments, this is an issue where I respectfully disagree

8   with my colleague on the other side that there is truly a

9   disagreement here, and I've tried to explain this and they

10   don't necessarily agree, so maybe there's a disagreement in

11   that sense.  But the definition that they focused on of

12   manufacturer payments, at least for Express Scripts, we

13   didn't redefine it to mean specifically tied to EpiPen.  We

14   just said it had to be a payment related to EpiPen or

15   connected to EpiPen, and so that would include -- and we've

16   told them this repeatedly -- both payments that are made

17   from Mylan to Express Scripts directly as a result of

18   utilization of EpiPen, as well as any other payments that

19   would be made to Express Scripts that have anything to do

20   with EpiPen, even if it's not directly for a specific

21   utilization.  And so in our view, our interrogatory

22   responses have fully answered all of their questions.  There

23   are no hidden payments or contracts or payment streams that

24   they've identified to us that haven't been covered by the

25   documents we produced in our interrogatory responses.

1          THE COURT:  And have you been clear in

2     representing that in your interrogatory responses, or -- in

3     other words, is there someplace where either in your sworn

4     interrogatory responses -- ideally in your sworn

5     interrogatory responses -- where you've made -- you've

6     represented that be to the case and have described that in

7     those terms as the scope of your response?

8          MR. COOPER:  I would have to double-check exactly

9     what our interrogatory responses say, but they say -- I

10    think the issue was we said, you know, we're providing the

11    information about payments -- I think we used the words

12    maybe "connected to" -- I forget the exact words -- "to

13    EpiPen," and they said, well, that means only when it's this

14    very specifically tied to, and we said no, we're not -- we

15    at least aren't meaning it in that sense.  We're meaning it

16    to mean any payments that have anything to do with EpiPen.

17    And so we've said that orally.  I'm not sure if it's spelled

18    out as explicitly in the interrogatory responses, but we've

19    certainly made that representation to them during our

20    meet-and-confers.

21          THE COURT:  Okay.  I guess I'd encourage you

22    first, obviously, to see whether kind of the thought bubble

23    over your head and the thought bubble over their head is the

24    same even though your words are different.  And then if it

25    is, if in fact -- and I realize that other defendants may

1     have approached this in a different way, but at least as far

2     as your clients are concerned, if in fact what you've looked

3     for is what they were asking for and you've just used

4     different words to describe it, then to the extent you can

5     clarify in your interrogatory responses that that's the

6     case, then I think that provides some comfort for them that

7     they've got that under oath and not simply in the course of

8     an oral conversation that may not be something they can

9     introduce into evidence later.  Do you see what I'm getting

10    at?

11         MR. COOPER:  I see what you're saying, Judge

12    Bowbeer, and the plaintiffs have sent us a letter that we're

13    reviewing and in the course of responding to, so that may be

14    one ultimate resolution.

15         THE COURT:  Which is not to say that oral

16    conversations aren't just as binding, but at the end of the

17    day they're entitled to an interrogatory response that

18    accurately describes the metes and bounds of what you did to

19    respond.

20         MR. COOPER:  Yes.  And then just moving quickly to

21    the plaintiffs' requests to third parties, we also aren't

22    aware at this point of any issues with their -- Mylan's

23    production in response to the plaintiffs' subpoenas.  As we

24    stated in our letter, we at least, Express Scripts, was not

25    aware of any Sanofi production until Plaintiffs' letter on

1    Monday, but we've since communicated with the plaintiffs and

2    they've agreed to produce to us those materials, so we

3    expect we'll be getting those soon.

4              We also didn't have any -- we have no -- obviously

5    any knowledge of Plaintiffs' subpoena to US Bank other than

6    that we now have received notice.  They first sent it to us

7    by mail, they subsequently sent it to us by email, the

8    notice, so we now know of that subpoena.  We don't know sort

9    of what the status is beyond that at this point.

10             THE COURT:  All right.  Thank you.

11             MR. COOPER:  Thank you.

12             THE COURT:  Who else would like to speak on behalf

13   of specific defendants?  Don't everybody jump up at once.

14             Ms. Stilson.

15             MS. STILSON:  Yes, Your Honor.  I just wanted to

16   make sure that nobody wanted to individually follow up on

17   what Mr. Cooper said on behalf of all Defendants.

18             Very short report for you, Your Honor, with

19   respect to agenda items 1c and d.

20             We are still -- there are basically three sets of

21   requests that have gone out to the plaintiffs from one which

22   is a common set of requests from all Defendants.  There's a

23   separate set of requests from Prime specifically to the

24   Kleins, and then a third set of requests from Optum and

25   United to the Illises.  And I believe that with respect to

1   all of them we are still in the process of meeting and

2   conferring with the plaintiffs on those responses.

3           As noted in the letter, we, Prime, sent the

4   Kleins -- the plaintiffs' counsel for the Kleins a letter on

5   our concerns about the sufficiency of those responses and we

6   hope to either see whether or not we'll reach resolution on

7   those or have anything that we think would require the

8   Court's attention.

9           We have had multiple meet-and-confers amongst all

10  of the parties, so all Defendants and the plaintiffs with

11  respect to the common requests, and I believe that a letter

12  memorializing those discussions and Defendants' concerns

13  will go out to the plaintiffs today, so nothing yet to

14  report on that front.

15          And then I understand from Optum and United that

16  they plan to continue to meet and confer with respect to

17  their specific requests on the Illises.

18          In terms of Defendants' requests to third parties,

19  as you know, Your Honor, and we've discussed at previous

20  status conferences, Prime has issued several third-party

21  subpoenas to a couple of entities.  We believe that we're

22  close to resolution on those issues with Blue Sea Capital.

23  I don't know yet whether or not that will end up being the

24  case, but we are hopeful.  We have not received any response

25  from Paychex and this was noted in the status letter and I

1    do believe that we are going to proceed with a motion to

2    compel.  We will have to bring that motion in the Western

3    District of New York because that is the court of

4    compliance, and so whether or not that dispute, Your Honor,

5    ends up in front of you, we'll just -- we'll have to see how

6    that plays out under Rule 45, so nothing more to report on

7    that.

8              THE COURT:  What about the issue or the concern

9    raised by Plaintiffs in their letter with respect to the

10   information that was produced by TriNet and some of the --

11             MS. STILSON:  Yes, Your Honor.  And I have not had

12   a chance to catch up with the plaintiffs on that.  We have

13   been treating those documents for now as highly

14   confidential.  We dispute that that's appropriate for all of

15   them, but we acknowledged Plaintiffs' concern and we have at

16   least, you know, at our offices and for anybody to whom we

17   provided those productions, we let them know about the

18   issue.  And I am hopeful -- and we also provided contact

19   information to Plaintiffs' counsel for the -- I don't know

20   if it's an in-house lawyer or a paralegal, but the in-house

21   legal contact at TriNet who produced those documents, and we

22   have not since heard whether or not any of the specific

23   designations in terms of confidentiality need to be updated.

24   But we certainly have been treating those documents as

25   highly confidential under the protective order subject to,

1    of course, our objection that we don't believe all of them

2    would be, but we hope that that can be resolved.

3            THE COURT:  Okay.  Yes.  My understanding -- and

4    I'll ask Plaintiffs' counsel to address it -- my

5    understanding is that there may be an effort under way to

6    have TriNet redo its production --

7            MS. STILSON:  Right.

8            THE COURT:  -- and eliminate what -- that highly

9    confidential, highly sensitive information so that the rest

10   could be treated in a more ordinary fashion, but I'll get an

11   update from Plaintiffs' counsel.

12           MS. STILSON:  Yeah, understood, Your Honor.  And

13   obviously the protective order that we do have in place, you

14   know, rest assured we are treating it as highly

15   confidential.  It is a qualified protective order that is

16   meant to, you know, cover personal information, so, you

17   know, we are treating it that way.  I don't want Your Honor

18   to think that we have not been.  And, you know, hopefully

19   with the plaintiffs' efforts we'll get a reproduction and go

20   from there.

21           THE COURT:  All right.

22           MS. STILSON:  All right.  Thank you, Your Honor.

23           THE COURT:  Who'd like to address any of the

24   matters relating to Defendants' discovery requests?

25           Ms. Obrist?

1          MS. OBRIST:  I just want to make sure they're all

2     done with the --

3          THE COURT:  Okay.  Were there other defendants who

4     wanted to speak to your own discovery?

5          Oh.  And it's also -- just so it's clear on the

6     record, I gather none of the other counsel for any of the

7     other defendants had anything to add with respect to the

8     matters discussed either my Ms. Obrist or Mr. Cooper about

9     the defendants' responses to Plaintiffs' discovery, is that

10    correct?

11       (No response)

12          THE COURT:  That seems to be correct.

13          Oh, Ms. Stilson.

14          MS. STILSON:  Your Honor, I just want to make one

15    factual correction.

16          Ms. Obrist is right that there is, you know, an

17    issue with respect to accessibility of some data for Prime,

18    and the date -- I just want the record to be clear -- is not

19    2014.  It's 2012.  But we're still working to see if we can

20    resolve those issues and hopefully won't require court

21    intervention on any of that.

22          Thank you, Your Honor.

23          THE COURT:  All right.  Thank you.

24          Mr. Dockery.

25          MR. DOCKERY:  Thank you, Your Honor.  As you know,

1      there's no ripe disputes before Your Honor and there's quite

2      a bit of detail that Ms. Obrist has gone into that I think

3      represents perhaps the plaintiffs' point of view in some of

4      these meet-and-confers.  And there's a great deal I think

5      that we could say, certainly I could say, regarding the

6      meet-and-confers that I've had with her to share with you my

7      point of view, but I'm not really sure that's productive.

8              And I do want to make sure that to the extent that

9      the Court wants to hear the full back-and-forth if the Court

10     is interested, we can certainly -- I can share with you a

11     lot about search terms.  I can tell you, for example, the

12     number of search terms we've already agreed to that do not

13     include EpiPen limiters, which is not something I think you

14     would have gathered from the exchange that occurred before,

15     but I'm not sure that it's productive.

16             And so I stand before you only to say that there

17     are things that have not been said and there's certainly

18     more to be done with the meet-and-confer process, and I

19     wouldn't want CVS's silence to somehow be taken to either be

20     in agreement with everything the plaintiffs said or to

21     suggest that there's nothing more to be added, but we

22     certainly don't think sitting here right now that there's

23     anything further that we need to share with Your Honor

24     before we meet and confer further with the plaintiffs.

25             And so with that said, if there's more that you

 1    would nonetheless want us to talk about on some of these

 2    issues, we stand ready to share.

 3              THE COURT:  No, I think -- I wanted to make sure

 4    that whatever you wanted to let me know at this juncture you

 5    had a chance to do.

 6              I'm hearing from you and from Ms. Obrist that the

 7    meet-and-confer process is ongoing and I will continue to

 8    put faith in that process.  I am going to have a question --

 9    I'll probably ask Ms. Obrist first when she gets back up --

10    and that is, is there a sense in terms of timing about when

11    you will have concluded that you've done as much as you can

12    with the meet-and-confer process and will need to get me to

13    weigh in, because I'd like to have a sense of when that's

14    likely to be and how quickly I may be pressed into service

15    in that regard.  So I am curious about that, but I might let

16    Ms. Obrist address that first and then see if you all have

17    anything further on it.

18              All right.  Thank you.  I appreciate the

19    clarification.

20              MR. DOCKERY:  Thank you, Your Honor.

21              THE COURT:  Whoops.  Yes.  Hold on.  We've got one

22    more.

23              MS. BROWN:  Good afternoon, Your Honor.  Liz Brown

24    for the Optum and United defendants.

25              THE COURT:  Yes.

1          MS. BROWN:  I just wanted to quickly update on

2     what we have agreed to produce so far, because it's specific

3     to our clients here.

4          So of the 129,000 documents that Ms. Obrist

5     referred to -- and I'm not sure whether it includes this

6     count, because these were some of the documents that they

7     mention in their update letter that were produced in the

8     last week or so, but we have produced more than 80,000

9     documents consisting of 823,000 pages that includes the

10    custodial production data, and it does not include certain

11    documents that we may agree to subject to our

12    meet-and-confers on the time frame issue as previously

13    discussed.

14         So we will be substantially completed with our

15    production of the documents that we intend to produce in

16    this case by May 15th, subject to, as Mr. Cooper mentioned,

17    the client sampling documents, certain documents that may be

18    responsive to the second RFPs, and any additional documents

19    that we agree to produce outside of the time frame that

20    we've agreed to produce already, 2011 to 2017.

21         On the data, I did also want to mention that we,

22    as Mr. Cooper mentioned for ASI, we also agree that the

23    plaintiffs probably have or they do have all of the data

24    that they have requested in this case.  Yes, it is the same

25    data that was produced in connection with the MDL, but based

1    on the discovery that was served in this case, the subject

2    matter that they requested, the fields and information

3    they've gotten pertain to those subject matters that they've

4    asked for.

5         We have produced to them a companion guide for our

6    claims data that shows what the fields mean and for the

7    standard claims report and that was recently produced, so

8    they do have that for data as well.

9         And we are continuing to meet and confer, you

10   know, subject to if they have certain questions about the

11   data or things that they think that they did not get, we're

12   willing to discuss those with them, but as far as we know,

13   they have everything that we would, you know, be producing

14   in response to their discovery requests.

15        I also wanted to -- as Mr. Dockery mentioned,

16   we're not going to go back and forth on the -- you know,

17   whether we agree with everything that Ms. Obrist said, but

18   we do agree, you know, that there is nothing from our

19   perspective that's ripe for dispute before this Court.

20        And I think that's all I have specifically on

21   behalf of Optum and United.

22        THE COURT:  Okay.  And that actually answered a

23   question that I was curious about, and that is, with respect

24   to data, although you have concluded for the most part or

25   perhaps entirely the data that was produced in the MDL was

1    the right data to produce in this case as well, you did

2    look -- you did look independently at these requests --

3              MS. BROWN:  Right.

4              THE COURT:  -- and didn't simply shortcut it and

5    say, "Well, whatever it was they asked for, we're going to

6    give them the MDL data."  You concluded that the MDL data

7    was the right set of data, responsive and relevant data, in

8    regards to their requests.

9              MS. BROWN:  Right.  So we did -- we reproduced

10   what we produced in the MDL and then also looked at what the

11   plaintiffs were, you know, seeking separately from that

12   specific request for the MDL production and identified that

13   the data that they're looking for in their specific requests

14   is in what we have already produced, yes.

15             THE COURT:  All right.  Thank you.

16             MS. BROWN:  Thank you.

17             THE COURT:  Anyone else for Defendants?

18        (No response)

19             THE COURT:  All right.  Now I think you get to get

20   up, Ms. Obrist.

21             MS. OBRIST:  All right.  I just want to address

22   the TriNet issue first that Ms. Stilson raised.

23             Our request to Prime was that the documents be

24   sequestered, not that they continued to be used and treated

25   as highly confidential, so that's a distinction that is

1     important.  And we thought we had confirmation that the

2     documents were sequestered.  They don't simply just need to

3     be reproduced with a highly confidential stamp.  There's

4     protected health information in there that needs to be

5     redacted under the protective order, never produced at all,

6     so that production does need to be redone.

7            And our expectation is that the defendants are not

8     using that information right now, but from the comments that

9     Ms. Stilson made, I don't think that sounds like what's

10    happening.  So that's a concern and we'll talk to them about

11    that, but our request was specifically for those documents

12    to be sequestered.

13           THE COURT:  All right.  Well, let me -- I guess

14    there are a couple pieces there and I will leave it to the

15    two of you to try to talk and work it out, but just so I

16    understand, I see a couple of issues.

17           One is, is someone working with TriNet to get a

18    new production?  And in that regard I didn't hear

19    Ms. Stilson saying that it would just be a production with a

20    new sticker, but a new production that redacts out highly

21    confidential and sensitive personal information which is not

22    relevant or responsive to the request.

23           MS. OBRIST:  Yes, that is the goal.  We are

24    working with them and we hope that that can happen quickly,

25    but it's a bit of a convoluted process.  It sounds like

1     they're working to figure out a vendor that can handle this.

2     It doesn't sound like they did that to start with, so they

3     are going to need to figure that out.  And we are working

4     with them, we've been in touch, so hopefully it can be

5     resolved quickly so that everyone can use the documents that

6     are appropriate to be used in the case, but until then the

7     documents should not be used.

8              THE COURT:  Well, but then -- so that gets to the

9     sequestration.  Are you saying -- because highly

10    confidential, I assume, is an outside-counsel's-eyes-only --

11    I can't remember if it's "outside counsel" or "counsel's

12    eyes only."

13             Are you saying that not even counsel then for the

14    defendants should be looking at these documents?

15             MS. OBRIST:  Right.  With respect to protected

16    health information, it shouldn't be accessible to anyone.

17    It's highly-sensitive personal information that has nothing

18    to do with the case and that the people who own that

19    information have a right not to have anyone seeing it right

20    now.

21             THE COURT:  All right.  So it does sound like --

22    and I'll let Ms. Stilson address that further if she cares

23    to here; otherwise, it sounds like that may be a

24    conversation you need to have in a little more detail.

25             MS. OBRIST:  We're happy to do that.

1          THE COURT:  Okay.

2          MS. OBRIST:  And I agree with you completely on

3     the manufacturer payment issue.  The big problem that we've

4     had on the manufacturer payment redefinition is precisely

5     what you identified, which is, it's all well and good for

6     lawyers to tell other lawyers what they really meant, but in

7     the end we need the client to verify under oath how things

8     worked.

9          THE COURT:  Agreed.  I agree.

10          MS. OBRIST:  And then you asked about when will

11     the meet-and-confers end.  We hope soon, but we do have a

12     few things that have been put off for different reasons.

13     Different defendants have different positions, and

14     Ms. Broadway-Brown articulated that Optum is probably likely

15     to be the one that is substantially complete, because Optum

16     search terms have been settled for awhile now, and Optum has

17     by far produced more documents than anyone else.

18          So otherwise, though, we haven't met and conferred

19     with Optum about interrogatories in full.  We have a second

20     set of RFPs and interrogatories that we haven't even

21     received the responses yet on the interrogatories.  We did

22     get our RFP responses, so we'll need to meet and confer on

23     those, but we just got those in.

24          So it's hard to put a date on it, but I think

25     we've probably got another month left of this before all the

1     issues are wrapped up.  And, you know, we will work very

2     hard to try and get these things buttoned up as soon as

3     possible.  I think there are a lot of issues that are still

4     outstanding that have been outstanding for awhile that are

5     close to being done, so hopefully we can get rid of the bulk

6     of it soon, but that is my view at least.  Others may

7     disagree.

8            THE COURT:  And my principal reason for asking --

9     obviously I want to make sure that the meet-and-confer

10    process continues with alacrity, so I want to make sure that

11    you're continuing to move things forward and that it isn't

12    allowed to drag.  My principal reason for asking, though,

13    was just so I could get some sense of, if there are going to

14    be motions, when am I going to be likely to see them so that

15    I can be planning ahead accordingly.

16           MS. OBRIST:  I think it'll be, you know, May and

17    June, probably, when you'll see the motions come in if they

18    happen.

19           And I can tell you I've been on the

20    meet-and-confer calls and there's not a week that goes by

21    that we don't have a large handful of calls, so we don't --

22    we're not just, you know, waiting around to have the calls.

23    They are happening and we are on the phone with the

24    defendants nearly every day, so we are pushing as hard as we

25    can to keep it going.

1        THE COURT:  That's fine and we'll just watch that

2    process.  It sounds like so far a lot has been resolved that

3    way, so hopefully in the next 30 days or so you'll be able

4    to get across the finish line with most, if not all, of the

5    rest.  But I think probably whatever isn't resolved in the

6    next 30 days, we probably need to start teeing up for motion

7    practice or else we really are going to be putting the rest

8    of the scheduling order at risk.

9        MS. OBRIST:  Right.  Agreed.

10       THE COURT:  Anything further from defense counsel

11   responding to any of that last conversation?

12    (No response)

13       THE COURT:  All right.  Ms. Stilson?

14       MS. STILSON:  Yes, Your Honor.  I guess

15   Plaintiffs' position that the PHI is irrelevant, I

16   understand it and I understand the redaction issue and that

17   they'd like the documents produced in that format.  I just

18   again want to reassure the Court -- and that is the basis

19   for their sequestration argument.

20       I want to be clear, Your Honor, however, that the

21   protective order clearly states that PHI can be designated

22   as highly confidential and appropriately protected, so I

23   don't want Plaintiffs to think that we are somehow just

24   willy-nilly distributing these documents to people.  We are

25   certainly not doing that.  We will look at the

1    redesignation.  And obviously that takes time.

2         The documents were produced to us by TriNet.

3    TriNet had an obligation to determine whether or not any of

4    those documents should be subject to confidentiality

5    designations.  They didn't do so.  And so, you know, we're

6    happy to work with Plaintiffs on this issue, but to ask us

7    just to completely set aside the documents, we certainly

8    have not, you know, been distributing them, we've notified

9    everyone of the issue, but to tell us not to look at them at

10   all -- and there are many documents that don't have PHI in

11   them.  I guess, you know, I'll leave that to work out with

12   them and hopeful that this is really a nonissue.

13        But I just want to make clear to Your Honor that

14   we are treating them at the highest level of protection that

15   is afforded under the protective order even though we

16   dispute that in fact every document in the production should

17   be subject to that sort of designation.  But I'm happy to

18   work with Plaintiffs to make sure, again, that this is a

19   nonissue, Your Honor.

20        THE COURT:  All right.  Thank you.

21        I think the only other item on the agenda was an

22   update, to the extent you care to share it, on the couple of

23   days that you all spent with Judge Keyes.

24        So would anyone -- and it's fine with me if

25   there's nothing about that that you'd like to share other

1    than he's a lovely man and a great mediator and you've had a

2    very pleasant time together.  But is there any kind of an

3    update that anyone wanted to provide?

4             Plaintiffs?

5             MS. OBRIST:  I would just say that we met for one

6    day.  We concluded at the end of the first day.

7             THE COURT:  Okay.

8             MS. OBRIST:  And my understanding was that Judge

9    Keyes was going to be in touch with you eventually.  So

10   that's all I have.

11            THE COURT:  All right.  Very well.

12            Anything further, Mr. Cooper?

13            MR. COOPER:  And I would just add, if it wasn't

14   clear, that obviously no agreement was reached nor do I

15   believe one is imminent.

16            THE COURT:  I figured that part out.

17       (Laughter)

18            THE COURT:  All right.  Anything on the agenda

19   that I have overlooked or didn't give adequate attention to?

20       (No response)

21            THE COURT:  Okay.  Anything that wasn't on the

22   agenda that you all decided before you came -- Ms. Obrist,

23   one other thing?

24            MS. OBRIST:  Just to follow up on the June 19th

25   hearing.  The dates for the associated deadlines, I'm

1    assuming you're going to put those in the order, but what we

2    calculated was June 12th for the joint agenda, June 13th for

3    the IDR moving party, June 17th for the update letter, and

4    June 18th for IDR response.  Does that sound right?

5            THE COURT:  Off the top of my head, yes, I believe

6    so.  I will make sure those are clear.  If for whatever

7    reason I think one of those needs to be tweaked, I will make

8    it clear in the order, but that sounds right just off the

9    top of my head, okay?  But thank you, yes.

10           All right.  Anything that you all had decided

11   among yourselves that wasn't on the agenda that you did want

12   to get on my radar this afternoon?

13           Going once.  Yes.

14           MS. OBRIST:  Given the extension of the schedule,

15   should we set conferences out to the end of the year is one

16   question.  I think our last one is calendared in August.

17           THE COURT:  Oh, good point.  Yes, yes.

18           MS. OBRIST:  So we thought maybe mid-October and

19   late November perhaps would be good.  I can't remember the

20   August date.  It's the end of August.  If you're doing five

21   or six weeks, then that would be about mid-October and then

22   maybe the end of November.  We haven't talked to Defendants

23   about this, but we were thinking about that recently when we

24   were looking at the new schedule.

25           THE COURT:  Yes, I think that makes good sense.

1     We can always cancel something if there's nothing to talk

2     about, but at least getting it on people's calendars at this

3     point I think does make sense.

4          Is there any disagreement by Defendants that we

5     ought to at least schedule these out every six weeks or so

6     to the end of the year?

7          MR. COOPER:  We have no disagreement, Your Honor.

8          THE COURT:  All right.  Then I think what I will

9     do is, when I issue an order on this June 12th conference, I

10    will reiterate any conferences that are already on the

11    schedule and then I will add conferences through the end of

12    the year, okay?

13         Anything else?

14       (No response)

15         THE COURT:  All right.  Thank you very much for

16    being here this afternoon and we are in recess.

17         THE CLERK:  All rise.

18       (Proceedings concluded at 3:05 p.m.)

19                    *    *    *    *

20

21

22

23

24

25

C E R T I F I C A T E

I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.


*/s/ Timothy J. Willette*


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224