UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: EpiPen ERISA Litigation | Case No. 17-cv-1884 (PAM/HB) |
| This Document Relates To: All Actions | **ORDER**<br><br>**FILED UNDER SEAL** |

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on Plaintiffs' Motion to Compel CVS Defendants' Responses to Plaintiffs' Request for Production of Documents and Interrogatories ("Plaintiffs' Motion to Compel CVS Defendants") [Doc. No. 407], and Plaintiffs' Motion to Compel Defendant Express Scripts' Responses to Plaintiffs' Request for Production of Documents and Interrogatories ("Plaintiffs' Motion to Compel ESI Defendants") [Doc. No. 413], which the Court took under advisement on June 19, 2019. *See* (June 19, 2019, Minute Entry [Doc. No. 439].) For the reasons set forth below, the Court will grant in part and deny in part the motions.

**I.     Background**

Plaintiffs' operative pleading alleges that that manner in which Defendants—as pharmacy benefit managers ("PBMs")—negotiated the formulary placement of EpiPen caused the price of EpiPen to skyrocket while lining Defendants' pockets in the process. They allege that Defendants breached fiduciary duties under in violation of 29 U.S.C. § 1104 and engaged in fiduciary self-dealing in violation of 29 U.S.C. § 1106. *See, e.g.*, (Consolidated Class Action Compl., "Compl." [Doc. No. 196 ¶¶ 1–10, 215–36].) In

1

particular, Plaintiffs allege that Defendants demanded and received "rebates, fees, discounts, or other payments or financial incentives from Mylan," "in exchange for inclusion and/or favorable placement of the EpiPen epinephrine auto-injector drug device (the 'EpiPen' or "EAI Device") on Defendants' formularies."[1] (*Id.* ¶ 3 (footnotes removed).)

    Defendants filed motions to dismiss, which were adjudicated by the Honorable Paul A. Magnuson, United States District Court Judge.  In his order, Judge Magnuson concluded that Plaintiffs had plausibly alleged that Defendants were fiduciaries under ERISA and that they had breached their fiduciary duties.  As to the existence of a fiduciary relationship, he found Plaintiffs had plausibly alleged Defendants had discretion or control over their compensation.  In that regard, he pointed to Plaintiffs' allegations that Defendants avoided their contractual obligation to remit to the plans any rebates received from Mylan by characterizing payments as "fees" or other types of payments rather than rebates.  By alleging that Defendants "could and did change how they characterized drug-manufacturer payments—as rebates, administrative fees, or other types of payments—to allow Defendants to keep more of the money and pay less to the plans," Plaintiffs plausibly alleged that Defendants could "control the amount they receive in rebates or other fees from Mylan and likewise exercise discretion over how much of that money is paid to the plans." *In re EpiPen Litig.*, 341 F. Supp. 3d 1015, 1019 (D. Minn. 2018).  As to whether Plaintiffs had adequately pleaded a breach of those

---

[1] In other submissions with the Court, the parties refer to the EpiPen as an "EAI Device."

2

asserted fiduciary duties, Judge Magnuson pointed to their allegations that Defendants had "negotiated such large 'rebates' and other payments from Mylan that it caused Plaintiffs' out-of-pocket expenses for EpiPens to increase exponentially." *Id.*

On the other hand, Judge Magnuson dismissed Plaintiffs' claim that Defendants had breached ERISA's prohibition on fiduciary self-dealing, 29 U.S.C. § 1106, on the ground that Plaintiffs had not adequately pleaded Defendants' conduct constituted dealing with plan assets. *Id.* at 1020–21.

In the instant motions, Plaintiffs seek to compel discovery, both by interrogatory and document requests, about all "manufacturer payments" made by EAI Device manufacturers to the CVS Caremark Defendants and to the ESI Defendants.

> The term "manufacturer payment" was defined to mean
>
> any proposed or actual payments, fees, funds, financial incentives, credits, rebates, or discounts that You sought or received from any EAI Device Manufacturer, or that any EAI Device Manufacturer offered or paid to You, regardless of whether You remitted or otherwise passed some or all of the payments, fees, funds, financial incentives, credits, rebates, or discounts to an affiliate, Plan, Third-Party Payer, or other entity. It includes, without limitation, administrative fees, data sales fees, health management fees, manufacturer administrative fees, service fees, purchase money discounts, purchase order discounts, price concessions, access rebates, performance or utilization rebates, market share rebates, price protection or inflation protection rebates, additional rebates, formulary rebates, and any other type of fee, credit, concession, discount, payments, or remuneration of any kind, whether in exchange for formulary placement, for services, or for any other purpose or for no purpose.

(Obrist Decl. Ex. A [Doc. No. 417-1 at 5–6].) The definition is pertinent to Plaintiffs' Requests Nos. 2, 6-9, 11, 13-14, 19-22, 24-25, 27-31, 33, and 39-40, as well as to their Interrogatory No. 3. *See* (Pls' Mem. in Supp. of Mot. to Compel CVS Defs. [Doc.

3

No. 409 at 5].[2])

Defendants do not (nor could they) object across the board to discovery about payments from EAI device manufacturers, but take issue with the breadth of Plaintiffs' definition of the term "manufacturer payments"; that dispute gives rise to the instant motions. While there is considerable overlap in the issues and arguments with regard to the two sets of defendants, *see, e.g.,* (Pls' Mem. in Supp. of Mot. to Compel CVS Defs. [Doc. No. 409 at 14–18]; Pls.' Mem. in Supp. of Mot. to Compel ESI Defs. [Doc. No. 415 at 21–27]), they differ in some respects, so the Court will address the motions individually herein. In addition, this Order will address a separate dispute between Plaintiffs and the ESI Defendants with regard to whether the latter must produce documents pertaining to a prior Department of Labor investigation into the ESI Defendants use of "plan assets to receive undisclosed rebates or other payments from drug manufacturers, undisclosed margins on pharmacy claims, and other undisclosed fees or compensation." *See* (Obrist Decl. Ex. U [Doc. No. 417-13 at 4]; *see also* (Pls.' Mem. in Supp. of Mot. to Compel ESI Defs. [Doc. No. 415 at 16–18].)

## II. Legal Standard

Federal Rule of Civil Procedure 26(b)(1), as amended effective December 1, 2015, provides that

Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in

---

[2] When referencing documents on the docket, CM/ECF pagination is used.

4

>resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

The 2015 amendments "restore[d] the proportionality factors to their original place in defining the scope of discovery." Fed. R. Civ. P. 26 advisory committee note to 2015 amendment. Moreover, the amended rule deleted the phrase "reasonably calculated to lead to the discovery of admissible evidence" because it had been relied upon, incorrectly, by both parties and courts to expand the scope of discovery. *Id.* As amended, however, the rule still allows for "[d]iscovery of nonprivileged information not admissible in evidence ... so long as it is otherwise within the scope of discovery." *Id.* The advisory committee note emphasizes that neither the requesting nor the responding party have the sole or even the primary burden of demonstrating the factors pertinent to proportionality; rather, it is a shared burden that depends on the parties' relative access to information bearing on those factors. *Id.*

Generally speaking, however, the party seeking the discovery must demonstrate that the materials sought "will likely establish…*relevant* legal or factual" information. *Luis v. RBC Capital Mkts., LLC*, No. 16-3873 (SRN/DTS), 2017 WL 7732242, at *2 (D. Minn. Dec. 20, 2017) (Schultz, Mag. J.) (emphasis in original). "Absent some indication beyond mere suspicion that a response to a discovery request is incomplete or incorrect, the mere fact that a party does not believe or does not agree with the response is not a basis to compel discovery." *Haddley v. Isanti Cty.*, No. 15-cv-2106 (DWF/LIB), 2016 WL 11004385, at *6 (D. Minn. May 31, 2016) (Brisbois, Mag. J.).

On the other hand, when it comes to an objection that discovery is unduly burdensome or that the relevance and importance of the information to the issues is outweighed by the burden of gathering it, the onus is necessarily on the responding party to show with specificity the burden of which it complains. "[U]nsupported assertions of burdensomeness and lack of proportionality" with no showing by affidavit of the expected cost and time associated with the requested discovery are generally not persuasive. *State Farm Mut. Auto. Ins. Co. v. Healthcare Chiropractic Clinic, Inc.*, No. 15-cv-2527 (SRN/HB), 2016 WL 9330708, at *2–3 (D. Minn. Sept. 2, 2016) (Bowbeer, Mag. J.).

## III. Plaintiffs' Motion to Compel Discovery About "Manufacturer Payments" From the CVS Caremark Defendants

The CVS Caremark Defendants objected to Plaintiffs' demand for discovery pertaining to the full scope of "manufacturer payments," as defined, on the ground that it was

> vague and ambiguous, overly broad, unduly burdensome, not relevant to the claims and defenses at issue in this litigation, and disproportionate to the needs of the case to the extent it purports to include "any. . . payment … from any EAI Device Manufacturer, or that any EAI Device Manufacturer offered or paid to [the CVS Caremark Defendants]" unrelated to EAI Devices specifically. For purposes of responding to these requests, the CVS Caremark Defendants construe this term to refer to monies (such as rebates and administrative fees) received by the CVS Caremark Defendants from EAI Device manufacturers in connection with EAI Devices.

(Obrist Decl. Ex. B [Doc. No. 417-2 at 11].) Thus, the CVS Caremark Defendants took issue with the request that they search for and produce information about payments that had been "sought" or "offered" but not "received" or "paid," and further stated that they

6

would limit their responses to "monies" received from EAI device manufacturers that were connected specifically with EAI devices. On the other hand, the CVS Caremark Defendants' objection was not clear about how, if at all, their view of "monies" diverged from Plaintiffs' demand for "payments, fees, funds, financial incentives, credits, rebates, or discounts."

Plaintiffs responded that the limited scope of this response did not fully encompass relevant information, pointing out that

> Information about any proposed Manufacturer Payments is relevant because, among other reasons, the PBMs' campaign to hide and/or re-characterize rebates by other names in order to retain profits requires an examination of all monies paid by manufacturers, as well as proposed payments during the negotiating process. Further, Documents regarding monies paid to CVS by an EAI Device Manufacturer for prescription drugs other than EAI Devices are also relevant given manufacturers' practice of "bundling" drugs by conditioning rebates on a PBM's inclusion of multiple drugs on its formularies.

(Obrist Decl. Ex. D [Doc. No. 417-3 at 9].)

After an extended period of meeting and conferring, Plaintiffs proffered an amended definition, as illustrated by this red-lined version:

> "Manufacturer Payment" means any proposed or actual payments, remuneration, fees, funds, financial incentives, credits, rebates, ~~or~~ discounts, or other monies that You sought or ~~received~~Received from any EAI Device Manufacturer, or that any EAI Device Manufacturer offered or paid to You, regardless of whether You remitted or otherwise passed some or all ~~of the~~such payments, remuneration, fees, funds, financial incentives, credits, rebates, ~~or~~ discounts, or other monies to an affiliate, Plan, Third-Party Payer, or other entity. It includes, without limitation, administrative fees, data sales fees, data access fees, data processing fees, health management fees, formulary management fees, clinical programming fees, manufacturer administrative fees, service fees, purchase money discounts, purchase order discounts, price concessions, access rebates, performance or utilization rebates, market share rebates, price protection or inflation

7

> protection rebates, additional rebates, formulary rebates, formulary placement fees, program fees, educational fees, promotional fees, fees charged for patient assistance, and any other type of fee, credit, concession, discount, ~~payments~~payment, or remuneration of any kind, whether in exchange for formulary placement, for services, or for any other purpose or for no purpose. However, this definition specifically excludes any monies You Received *solely* due to the utilization of a drug other than an EAI Device.

(Pls' Mem. in Supp. of Mot. to Compel CVS Defs. [Doc. No. 409 at 9–10].) Some of the changes to the definition simply added examples of the types of payments and other financial benefits received from a manufacturer that Plaintiffs seek to discover, but the final sentence of the amended definition did exclude monies received from a manufacturer that were solely attributable to the utilization of any drug other than an EAI device. Any payments sought or received that were not specifically tied to a device other than an EAI device, however, would still be covered by the amended definition.

The CVS Caremark Defendants rejected the amended definition proffered by Plaintiffs on the grounds that it continued to include proposed and not just actual payments, that the types of payments sought had nothing to do with formulary placement, and that the inclusion of payments regardless of whether they were "in exchange for formulary placement, for services, or for any other purpose or for no purpose" was "the epitome of a fishing expedition." (Obrist Decl., Ex. F [Doc. No. 417-5 at 2].) They stated, however, that they had conducted a reasonable investigation and were "unaware of any payments made by Mylan to the CVS Caremark Defendants that are not tied either to EpiPen devices or to other specific drugs," and, further, that they were unaware of any agreements between Mylan and the CVS Caremark Defendants other than commercial

8

rebate agreements already produced. (*Id.*) They also stated their assumption that Plaintiffs did not intend to seek information regarding the corporate subsidiaries who provide retail pharmacy services and who have not been named as defendants. (*Id.* at 3.[3]) In short, they asserted, based on their investigation they had "no reason to believe that the CVS Caremark Defendants entered into any contracts with Mylan other than rebate agreements, or received any payments from Mylan other than those made (1) pursuant to those same agreements and (2) in connection with specific drugs." (*Id.*) This motion followed.

Plaintiffs argue that a central issue in the case is whether Defendants "relabeled" rebates from the EAI device manufacturers so that they could keep the money rather than pay it to the plans. Thus, they argue, "it is critical that Plaintiffs obtain discovery of all payment streams and proposed payment streams by EAI Device manufacturers to the CVS Defendants—regardless of whether such payments are expressly tied to the utilization of EpiPen." (Pls' Mem. in Supp. of Mot. to Compel CVS Defs. [Doc. No. 409 at 13].) Furthermore, they argue, any burden associated with the search is proportional to the needs of the case because there are millions of dollars in controversy and only Defendants have access to the information.

Plaintiffs also point to documents received in discovery from Mylan that they allege call into question the CVS Caremark Defendants' insistence that all relevant

---

[3] The CVS Caremark Defendants also stated that they understood Plaintiffs' requests to exclude PBM services to Medicare Part D plans and that they would not produce Medicare Part D rebate agreements. (Obrist Decl., Ex. F [Doc. No. 417-5 at 3].) Plaintiffs' motion does not appear to challenge this exclusion.

9

payment streams from Mylan have been produced.  Specifically, they cite a February 7, 2011 letter from "CVS Caremark" to a Mylan subsidiary that purported to transmit "partially executed copies" of an agreement pursuant to which the Mylan subsidiary agreed to pay CVS Pharmacy, Inc. to deliver EAI Device prescription refill reminders to PBM health plan participants.  Additional documents produced by Mylan suggest the agreement was executed and subsequently extended by amendment.  This, Plaintiffs assert, is an example of an agreement involving EAI Devices and the PBM business that involves a payment made to the pharmacy business, raising the specter that rebates were not only recharacterized within the PBM business but may have been diverted to other CVS businesses.

The CVS Caremark Defendants argue that Plaintiffs have not shown the information they seek, beyond that already produced by Defendants, is relevant, and that Plaintiffs' arguments for a broader search are based on speculation that goes beyond the requirements of Rule 26(b)(1), particularly in the post-2015 amendment era.  *See* (CVS Defs.' Mem. in Opp'n [Doc. No. 429 at 10–11].)

Furthermore, the CVS Caremark Defendants argue that insofar as Plaintiffs seek discovery into agreements and payments between the EAI Device manufacturers and the retail pharmacy subsidiaries, it goes beyond the allegations in their operative pleading, which relate to the PBM business.  In addition, they argue that such discovery would require an expansion of their search into those subsidiaries, at a cost that is not proportional in view of the speculative relevance of the information sought.  Elaborating on this position at the hearing, they argued that negotiated agreements between the

10

manufacturers and the retail pharmacy business could only be relevant to Plaintiffs' allegations if the retail pharmacy and PBM businesses were linked, such that it would make sense for one to give up an economic benefit in favor of the other. (Hr'g Tr. [Doc. No. 448 at 51].) They argue that, to the contrary, the businesses are run separately and that nothing in the documents produced to date, including by Mylan, supports the idea that, for example, PBM rebates were being recharacterized as or traded for retail pharmacy discounts. (*Id.* at 56.) Moreover, they point out, if that were the case, one would expect to find documents and/or knowledgeable individuals both at Mylan and within the PBM business with information about such an arrangement, yet neither the Mylan production nor the production by the CVS Caremark Defendants contains such an agreement and inquiry of individuals within the PBM business who ought to know of such an arrangement, if it occurred, turned up nothing. (*Id.* at 57–59.) *See also* (Doruff Decl. [Doc. No. 431 at 74, ¶¶ 10, 12]; Heidenthal Decl. [Doc. No.431 at 77, ¶¶ 6, 8].[4])

After reviewing the arguments of counsel and the record before the Court, including Judge Magnuson's order on Defendants' motion to dismiss, the Court grants in part and denies in part Plaintiffs' motion to compel as against the CVS Caremark Defendants. First, the Court concludes that the proper scope of the inquiry with regard to "manufacturer payments" as to the CVS Caremark Defendants should be limited to proposed or actual payments or other remuneration, broadly defined, that the CVS

---

[4] The Doruff and Heidenthal declarations were appended to the declaration of Michelle Chen [Doc. No. 431]. For ease of reference, the Doruff and Heidenthal declarations use both CM/ECF pagination and specific paragraph numbers within the respective declarations.

11

Caremark Defendants sought or received from any EAI Device manufacturer, or that any EAI Device manufacturer offered or paid, in connection with—in whole or in part[5]— EAI devices and relating to the PBM business.  While Defendants object to extending the scope of discovery to anything other than *actual* payments, the Court concludes that information about *proposed* payments within the scope described above is relevant, as it may well provide background about what was really intended and whether it was later re-characterized (as Plaintiffs allege).

Accordingly, if the CVS Caremark Defendants have withheld or failed to conduct a reasonably diligent search for documents or information that would be responsive in light of the Court's modification to the definition of "manufacturer payment," they must be produced.  Furthermore, to the extent the scope of this term as now described by this Order requires that any interrogatory answer be supplemented, the CVS Caremark Defendants must do so.

On the other hand, the Court concludes that requiring the CVS Caremark Defendants to produce all information and documents relating to any actual or proposed payment or remuneration by an EAI manufacturer to any CVS Caremark business, excepting only those payments that cannot be explicitly and exclusively tied to some non-EAI device, is speculative and represents a fishing expedition that goes beyond the claims in this case, particularly in light of Judge Magnuson's discussion of the claims that

---

[5]  Thus, by way of example, if there were payments or proposed payments to the CVS Caremark Defendants' PBM business that were related to *both* EAI devices *and* other drugs, information responsive to Plaintiffs' discovery requests about those payments must be produced.

survived Defendants' motion to dismiss. For example, notwithstanding Plaintiffs' arguments to the contrary, Judge Magnuson described the surviving claims in terms of actions and payment streams specifically related to the PBMs. *See, e.g.*, *In re EpiPen Litig.*, 341 F. Supp. 3d at 1019 (stating that Plaintiffs plausibly alleged that Defendants, as PBMs, "control the amount they receive in rebates or other fees from Mylan and likewise exercise discretion over how much of that money is paid to the plans"); *id.* (concluding that Plaintiffs plausibly alleged a fiduciary relationship because it "stems not from the required contractual payments, but from the PBMs' actions that line its own pockets at the expense of plan participants").

For the avoidance of doubt, the scope of "manufacturer payments" as described herein does not include payments relating to Medicare Part D rebate agreements (nor does the Court understand Plaintiffs to argue otherwise). Furthermore, the Court will not require the CVS Caremark Defendants to search their retail pharmacy businesses for responsive documents and information.[6] At this point, Plaintiffs have done no more than speculate that "rebates to the PBM business are offset with discounts to the pharmacy business." That speculation is not sufficient. The Court is not persuaded that such a search would be proportional to the needs of the case in light of the sheer possibility that documents that somehow implicate Plaintiffs' claims against the PBM business might be there. The Court understands and expects, however, that the CVS Defendants have

---

[6] To be clear, the Court's decision on this point is not about whether a parent company has access to a subsidiary's documents, but whether relevant documents are likely to be found and whether the additional search efforts with regard to a separate business are proportional to the needs of the case.

conducted a reasonably diligent search of documents and made inquiry of knowledgeable individuals *within* the PBM business, for any information suggesting that agreements or remuneration between EAI Device manufacturers and the retail pharmacy subsidiaries in connection with EAI devices implicated the formulary placement or rebate agreement structure for EAI devices in the CVS Defendants' PBM business. If they have not made that diligent inquiry, they are ordered to do so. Depending on the results of that search, Plaintiffs are, of course, free to ask the Court to revisit the question of whether further searches on the retail pharmacy side of the business are reasonably likely to reveal relevant information and would be proportionate to the needs of the case.

Finally, the Court will order the CVS Caremark Defendants to set forth in sworn interrogatory responses the various representations made during the meet and confer process and to this Court about the results of their "reasonable investigations,"[7] into the existence of agreements or payment streams.

## IV. Plaintiffs' Motion to Compel Discovery Into Manufacturer Payments from the ESI Defendants

Based on the same revised definition of "manufacturer payments" set forth above (*see* pp. 7-8), Plaintiffs seek discovery from the ESI Defendants related to their mail-order pharmacy business. *See* (Pls.' Mem. in Supp. of Mot. to Compel ESI Defs. [Doc. No. 415 at 12–13, 21–27]; *see also* Obrist Decl. Ex. S [Doc. No. 417–13 at 3–4].) Specifically, they argue that given Judge Magnuson's use of "other payments" in his

---

[7] The Court interprets a "reasonable investigation" to include, at least, a diligent search for documents in those locations where such documents are most likely to be found, and a diligent inquiry of those individuals who are most likely to have responsive information.

14

order, "it is now critical that Plaintiffs obtain discovery of all payments and proposed payments by EAI Device manufacturers to the ESI Defendants—regardless of whether such payments are expressly tied to the utilization of EpiPen." (Pls.' Mem. in Supp. of Mot. to Compel ESI Defs. [Doc. No. 415 at 21].)

The ESI Defendants assert that this issue was resolved in their latest supplementation to the interrogatories, and if there is still a ripe dispute, that Plaintiffs' request is not relevant. (ESI Defs.' Mem. in Opp'n [Doc. No. 427 at 12–18].) For instance, the ESI Defendants argue that price rebates on EpiPens in the context of the mail-order business are not paid to PBMs, and even if they were, these price rebates "do not influence a drug's formulary position." (*Id.* at 14–15.) Consequently, the ESI Defendants maintain, Plaintiffs' theory that rebates or other payments negotiated by the PBM side of the business might be traded for purchase discounts negotiated by the mail-order pharmacy business is not embraced by the operative pleading. (*Id.* at 15.)

Similar to the CVS Caremark Defendants, the ESI Defendants also argued that Plaintiffs have in their possession a trove of documents from Mylan, as well as responsive documents from the ESI Defendants pertaining to negotiations for rebates (whether characterized as rebates, fees, or other renumeration), and that any documents relating to rebate negotiations would necessarily reflect whether those rebate negotiations affected or were affected by purchasing discounts in the mail-order pharmacy business. (Hr'g Tr. at 43–46.) Since all responsive documents regarding payment streams from Mylan to the ESI Defendants have been produced, (*id.* at 45), the ESI Defendants argue it is telling that none of those documents, either from Mylan or from the ESI Defendants,

15

suggests the existence of the kind of mail-order-purchasing-discount-for-PBM-rebate swapping that Plaintiffs hypothesize. (*Id.* at 39.) In addition, they point out that they have clearly and unequivocally stated in a sworn interrogatory response that their response *included* all monies received from Mylan in connection with the PBM business that were not specifically related to a drug other than an EAI Device. (ESI Defs.' Mem. in Opp'n [Doc. No. 427 at 6, 11]; Cooper Decl. Ex. 2 [Doc. No. 432-2 at 4].)

Finally, the ESI Defendants note that they had been clear with Plaintiffs since early in the discovery process that they did not intend to search for documents within their mail order pharmacy business, and that it was not until after they had largely completed their search and substantially completed their production that Plaintiffs came back to challenge that limitation. *See* (ESI Defs.' Mem. in Opp'n [Doc. No. 427 at 6–8].)

Here, too, the Court concludes the proper scope of the inquiry with regard to "manufacturer payments" as to the ESI Defendants should be limited to proposed or actual payments or other remuneration, broadly defined, that the ESI Defendants sought or received from any EAI Device manufacturer, or that any EAI Device manufacturer offered or paid, in connection with—in whole or in part—EAI devices and relating to the PBM business. To the extent the ESI Defendants have not responded with respect to proposed payments, they must supplement their responses accordingly, but insofar as Plaintiffs seek to compel them to search for documents pertaining to their mail order pharmacy business, the Court is persuaded by the ESI Defendants' arguments for reasons similar to those described above with respect to the CVS Caremark Defendants, and finds that such discovery is not relevant or proportional to the needs of the case. In this regard,

16

the Court bases its conclusion not only on the arguments as to the "merits" of the request with regard to relevance and proportionality, but also on the belated timing of Plaintiffs' challenge to the ESI Defendants' clearly-communicated exclusion of the mail order pharmacy business from the scope of their search and responses.

## V. Plaintiffs' Motion to Compel Discovery From the ESI Defendants Concerning the Department of Labor Investigation

Plaintiffs are also seeking additional discovery into a previous Department of Labor investigation (which started in 2003 and which the ESI Defendants received a letter from the Department of Labor in 2010), in which the Department of Labor concluded that the ESI Defendants were a fiduciary under ERISA on the basis of the ESI Defendants use of "plan assets to receive undisclosed rebates or other payments from drug manufacturers, undisclosed margins on pharmacy claims, and other undisclosed fees or compensation." *See* (Obrist Decl. Ex. U [Doc. No. 417-13 at 4]; *see also* (Pls.' Mem. in Supp. of Mot. to Compel ESI Defs. [Doc. No. 415 at 16–18].)  Plaintiffs argue that "the Department of Labor investigation appears to be on all fours with the issues in this case," because the letter pertaining to the investigation implicates both the ESI Defendants status as a fiduciary and that conduct alleged in Plaintiffs operative pleading. (Pls.' Mem. in Supp. of Mot. to Compel ESI Defs. [Doc. No. 415 at 19].)

The ESI Defendants initially requested that Plaintiffs' motion be denied without prejudice to give the ESI Defendants the time they needed to ascertain more details about the investigation at issue.  (ESI Defs.' Mem. in Opp'n at 22–23.)  At the hearing before the undersigned, the ESI Defendants represented that they had not withheld any non-

17

privileged documents that they had located on this issue and described steps they had taken to locate information related to the Department of Labor's investigation. (Hr'g Tr. at 68–71.) Specifically, the ESI Defendants represented that they reviewed all documents collected from the custodians related to this litigation and also searched the ESI Defendants internal databases or other locations where this type of information may have been kept. (*Id.*) Based on these representations, the Court instructed the ESI Defendants to provide an update letter to the Court regarding their efforts to locate and produce information responsive to this request. (*Id.* at 72–73; *see also* June 19, 2019 Minute Entry [Doc. No. 439 at 1–2].)

The ESI Defendants provided their update letter on June 28, 2019, describing the steps they took including: (1) running targeted searches of all electronically stored information for the "15 custodians agreed on by the parties"; (2) reviewing paper records located at off-site storage facilities pertaining to the Department of Labor investigation; (3) searching the files of Steptoe & Johnson, outside counsel that "currently handles ERISA-related matters for Express Scripts"; and (4) searching files of Gibson Dunn, former outside counsel, that was involved in the Department of Labor investigation. *See* (June 28, 2019 Letter [Doc. No. 443 at 2].) The ESI Defendants represent that these efforts yielded approximately 4,200 pages of non-privileged documents, which were either produced or in the process of being produced at the time of the letter. (*Id.* at 3.) At bottom, the ESI Defendants stated at the time of the letter that "it has produced, or is in the process of producing, all non-privileged documents relating to the DOL Investigation that it has located." (*Id.* at 3.)

Given the ESI Defendants' representation on this issue, the Court concludes that there is no ongoing controversy. Specifically, the Court is satisfied that the ESI Defendants exhausted all reasonable efforts to locate responsive documents. Furthermore, the ESI Defendants represent that by now they have produced all non-privileged documents responsive to Plaintiffs' request concerning the Depart of Labor's investigation. *See* (Hr'g Tr. at 68–71; June 28, 2019 Letter at 2–3.) As a result, the Court denies Plaintiffs' Motion to Compel the ESI Defendants in this regard as moot.

## VI. Conclusion

Based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion to Compel CVS Defendants' Responses to Plaintiffs' Request for Production of Documents and Interrogatories [Doc. No. 407], is **GRANTED in part** and **DENIED in part** as fully set forth herein.

2. Plaintiffs' Motion to Compel Defendant Express Scripts' Responses to Plaintiffs' Request for Production of Documents and Interrogatories [Doc. No. 413] is **GRANTED in part** and **DENIED in part** as fully set forth herein.

The parties shall show cause on or before fourteen (14) days from the date of this Order why the Court should not unseal the Order, and shall specify any portion of the Order that they claim warrants redaction.

Dated: August 29, 2019      s/ *Hildy Bowbeer*
                            HILDY BOWBEER
                            United States Magistrate Judge