**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

In re EpiPen ERISA Litigation,

(This Document Applies to All Cases)

Case No. 0:17-1884-PAM-HB

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

**FILED UNDER SEAL PURSUANT TO LOCAL RULE 5.6**

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................... 1

II.   BACKGROUND ........................................................................ 4

    A.    Factual Background ............................................................ 4

        1.    EpiPens Are Life-Saving Medical Devices. .................................. 4

        2.    Plaintiffs Purchased EpiPens Through ERISA Plans...................... 5

        3.    Plaintiffs Paid Money Out of Pocket for Their EpiPens. ................ 5

        4.    The Defendant PBMs Provided Pharmacy Benefit Management
Services to Plaintiffs' ERISA Plans. ................................................ 6

        5.    The PBMs "Manage and Administer Prescription Drug
Benefits," Including by Negotiating "Rebates" and Other Fees
Paid by Pharmaceutical Companies. ............................................... 7

        6.    The PBMs' Rebates and Fees Increased Participant Costs. ............ 9

        7.    The PBMs Could Have Used the Rebates and Fees They
Received to Lower Participants' Out-of-Pocket Costs. ................ 12

    B.    Facts Demonstrating Common Conduct. ................................ 16

        1.    Each PBM Obtained Rebates and Fees on ERISA Plan
Participants' EpiPen Purchases Pursuant to a Common Contract. 16

            a.    A Common Contract Covers All ERISA Plans Served by
ESI. .................................................................................... 17

            b.    A Common Contract Covers All ERISA Plans Served by
CVS. ................................................................................... 21

            c.    A Common Contract Covers All ERISA Plans Served by
OptumRx. ........................................................................... 25

            d.    A Common Contract Covers All ERISA Plans Served by
Prime. ................................................................................. 28

2.  Each PBM Obtained Increased Rebates Through Common Negotiations. .............................................................. 31

3.  Each PBM Obtained Additional Forms of "Rebates" Under Its Common Contracts. ....................................... 34

4.  Each PBM Obtained a Separate, Common Administrative Fee on EpiPens Purchased by Plan Participants. ................................. 36

5.  The PBMs Leveraged Their Relationships with All Plans They Served to Obtain Greater Rebates and Fees. ............................... 38

6.  The PBMs Exchanged Formulary Placement for Higher Rebates and Fees. ............................................................ 40

7.  The PBMs Did Not Disclose their Rebate and Fee Agreements to Plan Participants. ....................................... 42

III.    Class Claims ...................................................................... 43

IV.    Class Definitions................................................................ 48

        A.  The "ESI Class" ........................................................ 48

        B.  The "CVS Class" ....................................................... 48

        C.  The "OptumRx Class"................................................. 49

        D.  The "Prime Class" .................................................... 49

V.    ARGUMENT ..................................................................... 50

        A.  The Legal Standard for Certification ................................... 50

        B.  The Classes Are Ascertainable. ........................................ 50

        C.  The Classes Satisfy Rule 23(a). ....................................... 53

            1.  The Classes Are Sufficiently Numerous. ....................... 53

            2.  The Questions of Law and Fact Are Common to the Classes. ...... 53

            3.  Plaintiffs' Claims Are Typical of Those of Their Respective Class(es)..................................................... 55

       4.     Plaintiffs Will Fairly and Adequately Protect the Interests of the Classes. ...................................................................................... 56

   D.    The Classes Satisfy the Requirements of Rule 23(b). ............................ 57

       1.     The Classes Should be Certified Under Rule 23(b)(1)(A). ........... 57

       2.     Alternatively, the Classes Should be Certified Under Rule 23(b)(3). ................................................................................... 61

            a.    Common Issues Predominate. ............................................ 61

                (i)     Fiduciary Status ...................................................... 62

                (ii)    Breach of Fiduciary Duties..................................... 65

                (iii)   Remedies ................................................................. 66

            b.    A Class Action Is Superior to Other Available Methods of Adjudication. ............................................................... 72

VI.   CLASS COUNSEL........................................................................................... 73

VII.  CONCLUSION ............................................................................................... 75

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abraha v. Colonial Parking, Inc.*,
    243 F. Supp. 3d 179 (D.D.C. 2017) ......................................................................... 64

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ....................................................................................... 57, 61

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ............................................................................................. 61

*In re Beacon Assocs. Litig.*,
    282 F.R.D. 315 (S.D.N.Y. 2012) ........................................................................... 62

*CIGNA Corp. v. Amara*,
    563 U.S. 421 (2011) ............................................................................................. 67

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ........................................................................................ 68, 71

*Day v. Celadon Trucking Servs.*,
    827 F.3d 817 (8th Cir. 2016) ................................................................................. 70

*DeBoer v. Mellon Mortg. Co.*,
    64 F.3d 1171 (8th Cir. 1995) ................................................................................. 57

*Donovan v. Bierwirth*,
    754 F.2d 1049 (2d Cir. 1985) ................................................................................ 71

*Doran v. Mo. Dep't of Soc. Servs.*,
    251 F.R.D. 401 (W.D. Mo. 2008) .......................................................................... 56

*Ebert v. Gen. Mills, Inc.*,
    823 F.3d 472 (8th Cir. 2016) ................................................................................. 50

*Elizabeth M. v. Montenez*,
    458 F.3d 779 (8th Cir. 2006) ................................................................................. 50

*In re EpiPen ERISA Litig.*,
    341 F. Supp. 3d 1015 (D. Minn. 2018) ............................................................. 44, 45

*Otte ex rel. Est. of Reynolds v. Life Ins. Co. of N. Am.*,
   275 F.R.D. 50 (D. Mass. 2011) .................................................................. 62

*F.H. Krear & Co. v. Nineteen Named Trs.*,
   810 F.2d 1250 (2d Cir. 1987) ...........................................................45, 64

*Figas v. Wells Fargo & Co.*,
   2010 WL 2943155 (D. Minn. Apr. 10, 2010) ........................................ 60

*Greater St. Louis Constr. Laborers Welfare Fund v. D&H Concrete, Inc.*,
   2008 WL 2437419 (E.D. Mo. June 12, 2008) ......................................... 68

*Gregory v. EBF & Associates, L.P.*,
   2010 WL 11537515 (D. Minn. May 7, 2010) ......................................... 73

*Haddock v. Nationwide Fin. Servs., Inc.*,
   293 F.R.D. 272 (D. Conn. 2013) ............................................................ 62

*Harju v. Olson*,
   709 F. Supp. 2d 699 (D. Minn. 2010) ...............................................58, 60

*Ihrke v. N. States Power Co.*,
   459 F.2d 566 (8th Cir. 1972), *vacated due to mootness*, 409 U.S. 815
   (1972) ...................................................................................................... 50

*Martin v. Feilen*,
   965 F.2d 660 (8th Cir. 1992) .................................................................. 71

*McKeage v. TMBC, LLC*,
   847 F.3d 992 (8th Cir. 2017) ...........................................................50, 51, 52

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993) ............................................................................... 66

*Olson v. E.F. Hutton & Co.*,
   957 F.2d 622 (8th Cir. 1992) .................................................................. 64

*Parke v. First Reliance Standard Life Ins. Co.*,
   368 F.3d 999 (8th Cir. 2004) .................................................................. 67

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   582 F.3d 156 (1st Cir. 2009) .................................................................. 68

*Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*,
   722 F.3d 861 (6th Cir. 2013) .................................................................. 64

v

*Postawko v. Mo. Dept. of Corr.*,
910 F.3d 1030 (8th Cir. 2018) ..............................................................55, 56

*Roth v. Sawyer-Cleator Lumber Co.*,
61 F.3d 599 (8th Cir. 1995) ...................................................................... 71

*Rozo v. Principal Life Ins. Co.*,
2017 WL 2292834 (S.D. Iowa May 12, 2017)................................54, 59, 60

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
821 F.3d 992 (8th Cir. 2016) .........................................................50, 51, 52

*Silva v. Metro. Life Ins. Co.*,
762 F.3d 711 (8th Cir. 2014) ................................................................... 67

*Stuart v. State Farm Fire & Cas. Co.*,
910 F.3d 371 (8th Cir. 2018) ................................................................... 61

*In re Target Corp. Customer Data Sec. Breach Litig.*,
309 F.R.D. 482 (D. Minn. 2015) (Magnuson, J.) ...........................53, 62, 68

*In re Target Corp. Customer Data Sec. Breach Litig.*,
847 F.3d 608 (8th Cir. 2017), *amended*, 855 F.3d 913 (8th Cir. 2017)..................... 56

*Teets v. Great-W. Life & Annuity Ins. Co.*,
315 F.R.D. 362 (D. Colo. 2016) .........................................................59, 62

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016) ............................................................................ 68

*Wagner v. NutraSweet Co.*,
95 F.3d 527 (7th Cir. 1996) ..................................................................... 56

*Wal–Mart Stores v. Dukes*,
564 U.S. 338 (2011) ...........................................................................53, 54

*In re Wholesale Grocery Prods. Antitrust Litig.*,
2016 WL 4697338 (D. Minn. Sept. 9, 2016)............................................ 51

*Yost v. First Horizon Nat'l Corp.*,
2011 WL 2182262 (W.D. Tenn. June 3, 2011) .................................*passim*

**Rules & Statutes**

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A)....................................43, 62, 63

ERISA § 3(32), 29 U.S.C. § 1002(32) ............................................................. 53

ERISA § 3(33), 29 U.S.C. § 1002(33) ............................................................. 53

ERISA § 4(a)(1), 29 U.S.C. § 1003(a)(1)......................................................... 53

ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)........................................46, 58, 66

ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)...........................................43, 47, 66, 67

Fed. R. Civ. P. 23 .....................................................................................*passim*

## Other Authorities

Brief in Opposition, *Rutledge v. Pharm. Care Mgmt. Ass'n*, No. 18-540
(U.S. Feb. 28, 2019) .................................................................*passim*

*Insights: Point of sale discounts mean lower costs*, Optum,
https://www.optum.com/resources/library/point-of-sale.html (last
visited Dec. 10, 2019) ......................................................................13, 15

John H. Langbein et al., Pension and Employee Benefit Law (6th ed. 2015)................. 58

Jon Roberts, *Consumer Transparency Helping Members with High-Cost
Drugs at the Point of Sale*, CVS Health (June 7, 2017),
https://payorsolutions.cvshealth.com/insights/consumer-transparency...................... 13

*The Rebate Debate*, Express Scripts (June 29, 2017), https://www.express-
scripts.com/corporate/articles/rebate-debate ........................................... 12

Restatement (Third) of Trusts § 95, and Comment a (Tent. Draft No. 5,
Mar. 2, 2009) ............................................................................ 67

Successful Prescription Drug Discount Program Expands to Benefit More
Consumers at Point-of-Sale, UnitedHealth Group (Mar. 12, 2019),
https://www.unitedhealthgroup.com/newsroom/2019/2019-03-12-
prescription-drug-program-expands-to-benefit-consumers-point-of-
sale.html...................................................................................14, 15

2 William B. Rubenstein, *Newberg on Class Actions* § 4:12 (5th ed. 2019) ..58, 60, 68, 70

## I.  INTRODUCTION

Plaintiffs Susan Illis, Elan and Adam Klein, and Emil Jalonen (collectively, "Plaintiffs") bring this action under the Employee Retirement Income Security Act ("ERISA") on behalf of participants and beneficiaries of ERISA-governed health benefit plans who were forced to overpay for life-saving EpiPens as a result of a common scheme conducted by the nation's four largest pharmacy benefit managers ("PBMs"). EpiPens are epinephrine auto-injector ("EAI") devices prescribed to treat severe allergic reactions, often in children. The PBMs are middlemen that manage pharmacy benefits for the majority of the nation's health benefit plans. Each PBM worked to obtain so-called "rebates" and other fees from Mylan, the company that markets and sells EpiPens, as a condition for making EpiPens available to the participants and beneficiaries of the thousands of ERISA plans it serves.[1] These ever-increasing rebates and fees were a cause of the increasing price of EpiPens, and as a result, ERISA plan participants paid too much for life-saving medication.[2]

The PBMs' control over plan management—including by setting conditions for drugs to be available to participants—made them fiduciaries under ERISA, which measures fiduciary status based not on formal titles or subjective beliefs, but instead upon objective, functional criteria. As fiduciaries, the PBMs owed the duty of loyalty to plan

---

[1] Unless otherwise stated, "participants and beneficiaries" are referred to herein as "participants."

[2] Mylan, for its part, had every incentive to pay these rebates and fees to ensure that EpiPens received coverage (or preferential treatment) under benefit plans. In so doing, Mylan maintained its domination of the EAI market and prevented competitors from gaining a foothold in the market.

participants. Unfortunately, rather than acting "solely" in the interest of plan participants, as the duty of loyalty mandates, the PBMs used their positions to obtain ever-increasing payments from Mylan that benefited themselves and harmed participants.

While the forms of payments evolved over time to include "rebates," "administrative fees," "price protection" payments, and other monies, one fact never changed: ERISA plan participants were increasingly harmed. Despite the PBMs' claims that they shared certain of these payments to reduce the "net price" that their *clients* paid for drugs, ERISA plan *participants* did not benefit from any reduced net price. Instead, Class members' cost-sharing payments for coverage of their EpiPen purchases (i.e., deductible and/or percentage co-insurance payments) were calculated as a function of the EpiPen "list price," which grew precipitously during the respective Class Periods[3] as Mylan paid greater rebates and fees to the PBMs.[4]

Plaintiffs' breach-of-fiduciary-duty claims are well-suited for class treatment under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs move to certify four Classes, one for each of the Defendant PBMs. *See infra* pp. 48-50. Rule 23(a)'s numerosity and commonality requirements are easily met because, for each PBM, a single, common contract with Mylan—and common ongoing negotiations of amendments thereto—determined the rebates and fees the PBM received with respect to all EpiPen purchases by tens or hundreds of thousands of participants in all ERISA plans it served.

---

[3] The Class Periods are defined *infra* pp. 48-50.

[4] Participants who paid only flat copays—i.e., fixed-dollar amounts that were not a function of the list price—are not within the Classes. *See infra* pp. 48-50.

The claims of each Plaintiff are typical of those of the Class(es) they seek to represent.[5] Each PBM owed common fiduciary duties to all participants in the ERISA plans it served, and the PBM's common conduct violated those duties as to all participants who purchased EpiPens. Each Plaintiff also satisfies the adequacy requirement, as each has common interests with the members of their respective Class(es) and will continue to vigorously prosecute the interests of their respective Class(es) through qualified counsel.

The Classes are prime examples of Rule 23(b)(1)(A) classes. ERISA's fiduciary duty of loyalty requires fiduciaries to treat all plan participants alike, and each PBM is engaged in a common scheme pursuant to a common contract with Mylan. If the PBM's common conduct violates ERISA as to one participant, it violates ERISA as to all. Accordingly, there is a strong "risk" that "inconsistent or varying adjudications with respect to individual class members would establish incompatible standards of conduct" for the PBMs. Fed. R. Civ. P. 23(b)(1)(A).

In the alternative, the Classes satisfy the predominance and superiority requirements of Rule 23(b)(3). Issues common to each Class predominate over individual issues. As explained in detail below, fiduciary status and breach will be evaluated by applying uniform ERISA principles to common evidence of each PBM's common efforts to obtain rebates and fees on all EpiPens purchased by all ERISA plan participants.

---

[5] Plaintiff Jalonen seeks to represent both the CVS and ESI Classes, as described below.

Monetary remedies will be determined according to common methodologies using inputs from common data sets produced by each PBM.

Finally, a class action is superior to other available methods of resolving this matter. Resolving the core factual and legal issues for each Plaintiff will resolve them for the entire respective Class, and adjudication on an individual, participant-by-participant basis would make little sense. Moreover, given the immense costs of litigating claims of this nature, class litigation is the only practical recourse for the members of the Classes.

Plaintiffs respectfully request that the Court certify the four Classes.

## II. BACKGROUND

**A. Factual Background**

**1. EpiPens Are Life-Saving Medical Devices.**

Epinephrine is used to treat anaphylaxis, a sudden and potentially life-threatening allergic reaction to insect stings, foods, medications, and other allergens.[6] The EpiPen is an auto-injector device used to easily and safely administer the appropriate dosage of epinephrine in the event of an anaphylactic episode. Compl. ¶ 53. In 2007 Mylan, Inc. acquired Dey, L.P. and, along with it, the rights to market and sell EpiPens. Schondelmeyer Report ¶¶ 117-18. Dey was renamed Mylan Specialty L.P. in 2012.[7]

---

[6] *See* Consolidated Class Action Complaint ("Compl.") ¶ 53, ECF No. 196; Expert Report of Dr. Stephen W. Schondelmeyer ("Schondelmeyer Report") ¶¶ 108-112, filed contemporaneously herewith.

[7] Unless otherwise stated, Mylan, Inc. and Mylan Specialty L.P. are referred to collectively as "Mylan."

### 2. Plaintiffs Purchased EpiPens Through ERISA Plans.

Plaintiffs purchased EpiPens through ERISA-governed health benefit plans sponsored by employers. Compl. ¶¶ 11-29. The Kleins purchased EpiPens because their minor son has severe food allergies. *Id.* ¶ 14. Ms. Illis purchased EpiPens because her teenage daughter has severe food allergies. *Id.* ¶ 26. Mr. Jalonen is the Personal Representative of the Estate of Leah Weaver. *See* ECF Nos. 335, 337, 346. Ms. Weaver had purchased EpiPens because her now-teenage daughter has a severe food allergy. Compl. ¶ 18.

### 3. Plaintiffs Paid Money Out of Pocket for Their EpiPens.

Although Plaintiffs' health plans provided coverage for prescription medications, these plans, like many health plans, required participants to satisfy deductibles and make coinsurance payments for prescription medications, including EpiPen. *See, e.g.*, *id.* ¶¶ 13-29, 124-39. The Kleins paid hundreds of dollars in deductible payments for EpiPens on at least three occasions in 2015 and 2017. *Id.* ¶¶ 15-17. Ms. Illis paid hundreds of dollars in deductible and percentage co-insurance payments for EpiPens on multiple occasions between 2013 and 2016. *See Id.* ¶¶ 27-29. Ms. Weaver paid hundreds of dollars in deductible and coinsurance payments for EpiPens on multiple occasions in 2013, 2014, and 2015. *Id.* ¶¶ 19-22. ███████████████████

██████[8]

---

[8] *See* Expert Report of Stephan M. Levy, Ph.D. Regarding Class Certification ("Levy Report") ¶ 75, Table 2, filed contemporaneously herewith.

**4.  The Defendant PBMs Provided Pharmacy Benefit Management Services to Plaintiffs' ERISA Plans.**

Each Plaintiff's ERISA plan received pharmacy benefit management services from one or more of the Defendant PBMs. The Kleins' plan was serviced by Prime Therapeutics, LLC ("Prime"), Compl. ¶ 14, which is owned by more than a dozen Blue Cross and Blue Shield entities (the "Blues"), and provides PBM services to more than 20 million participants in health plans nationwide, *id.* ¶ 49.

Ms. Weaver's plan was served by two families of PBM defendants. From 2013 through 2014, and again in 2017, Weaver's plan received PBM services from the Express Scripts Defendants (collectively, "ESI").[9] Compl. ¶¶ 18-20, 23; *see also infra* pp 17, 31-32. ESI provides PBM services to more than 83 million participants in health plans nationwide. Compl. ¶ 36.

During 2015, Weaver's plan received PBM services from the CVS Caremark Defendants (collectively, "CVS"). *Id.* ¶¶ 21-22.[10] CVS provides PBM services to more than 90 million participants in health plans nationwide. *Id.* ¶ 30.

Ms. Illis's plan received administration services from Defendant UnitedHealthcare Services, Inc., *see, e.g.*, ECF No. 241 ¶¶ 5-7, which is a subsidiary of Defendant UnitedHealth Group, Inc. (collectively "UnitedHealth"), Compl. ¶ 41-42. ███████

---

[9] Defendants Medco Health Solutions, Inc. ("Medco") and Express Scripts, Inc. are both subsidiaries of Defendant Express Scripts Holding Company ("ESHC"). Compl. ¶¶ 36-39. Medco has been a subsidiary of ESHC since merging in 2012.

[10] Defendants CaremarkPCS Health L.L.C., which does business under the name CVS Caremark, and Caremark LLC both provide PBM services and are subsidiaries of Defendant Caremark Rx, L.L.C., a subsidiary of Defendant CVS Health Corporation. Compl. ¶¶ 30-34.

███████████████████████. *See, e.g.*, ES_000000137 ¶ 2 (PX1); MYERISA-00056879 at 883 (PX2).[11] █████████████, UnitedHealth began using its internal PBM, Defendant OptumRx, to provide pharmacy benefit management services to its health plans, including Illis's plan. *See, e.g.*, Compl. ¶ 26; MYERISA-00056879 at 883 (PX2).[12] OptumRx provides PBM services to more than 65 million participants in health plans nationwide. *Id.* ¶ 41.

### 5. The PBMs "Manage and Administer Prescription Drug Benefits," Including by Negotiating "Rebates" and Other Fees Paid by Pharmaceutical Companies.

According to the PBMs' national trade association, the Pharmaceutical Care Management Association ("PCMA"), PBMs "are third-party administrators that *manage prescription drug benefits* on behalf of various entities that provide healthcare benefits, including ERISA-governed health benefit plans." Brief in Opposition at i, *Rutledge v. Pharm. Care Mgmt. Ass'n* ("*Rutledge* BIO"), No. 18-540 (U.S. Feb. 28, 2019), https://tinyurl.com/yyo2x769.[13] "Specifically, health plans enter into contracts with PBMs to manage and administer prescription-drug benefits." *Id.* at 3. "PBMs process and pay prescription drug claims, create networks of pharmacies at which prescriptions will

---

[11] "PX___" refers to the Exhibits to the Declaration of Matthew Gerend in Support of Plaintiffs' Motion for Class Certification, filed contemporaneously herewith.

[12] Defendant OptumRx, Inc. is a subsidiary of Defendant OptumRx Holdings, L.L.C., which is a subsidiary of Defendant Optum Inc., which is a subsidiary of UnitedHealthcare Services, Inc. *See* Compl. ¶¶ 42-46. As used herein, "OptumRx" refers collectively to OptumRx, Inc., OptumRx Holdings, L.L.C., and Optum Inc. As of January 1, 2013, "OptumRx" further refers to UnitedHealth.

[13] Citations, internal quotations, and footnotes omitted and emphasis added unless otherwise noted.

be filled for a specified price, operate mail order pharmacies, design pharmaceutical benefits, create formularies, and negotiate for discounts or rebates." *Id.* 3-4.

Two aspects of these PBM services—formularies and rebates—warrant further explanation. *First*, a formulary is a list of drugs covered by health plans. Compl. ¶ 72. Most formularies have multiple tiers of coverage that determine the level of benefits the plan will provide (and the correlating amount the participant will need to pay through a co-pay or percentage coinsurance). *Id.* ¶ 73; *see also* Schondelmeyer Report ¶¶ 83-84, 86-87. The more favorable the tier, the greater share of the drug cost covered by the plan. *Id.* Formularies can also dictate whether more than one drug within a specific therapeutic category (e.g., EAI devices) will be covered and, if so, whether one or more drugs within a category will be given greater benefit coverage. Schondelmeyer Report ¶¶ 80-90. Each PBM managed at least one template, proprietary formulary that was made available to the plans it served. *See* Compl. ¶¶ 93-96; Schondelmeyer Report ¶¶ 82-83. The PBMs also worked with certain clients to create customized formularies. *Id.*

*Second*, each PBM negotiated with pharmaceutical manufacturers and marketers, including Mylan, for "rebates" and other fees that the pharmaceutical company would pay for every prescription filled by a plan participant so long as the drug purchased was included within applicable formularies. Compl. ¶¶ 72, 75-79, 97-103. The PBMs obtained even greater rebates and fees if a drug was favored over competing drugs within applicable formularies. *Id.* ¶¶ 80-92. These rebates and fees were generally calculated as a percentage of each drug's list price, based on each prescription filled, and paid by the pharmaceutical company to the PBM on a periodic basis. *Id.* ¶¶ 75-77, 102.

As described in detail *infra* pp. 31-37, the PBMs obtained ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████.

Although the PBMs shared *some* of these rebates and fees with certain clients (entities

that hired them to provide PBM services), they also kept considerable portions for their

own benefit. Compl. ¶¶ 8, 115, 157-59. The PBMs generally did *not* share rebates or fees

with plan participants. *Id.* ¶¶ 114, 144, 160.

### 6. The PBMs' Rebates and Fees Increased Participant Costs.

The rebates and fees obtained by the PBMs increased the EpiPen "list price,"

which in turn increased the deductible and coinsurance payments Class members paid for

EpiPens. "List price," which is also known as the "WAC" or "AWP," is the price at

which a pharmaceutical company sells a drug.[14] Participant deductible and coinsurance

payments are a function of a drug's list price. *See* Compl. ¶¶ 125-29, 132-36. In some

instances, the deductible and coinsurance payments are equal to, or a percentage of, the

list price itself. *Id.* In other instances, the deductible and coinsurance payments are equal

to, or a percentage of, a negotiated price that is, in turn, a percentage of the list price. *Id.*

But in all cases, as the list price increases, the participant coinsurance or deductible

---

[14] "List price" may refer to the Wholesale Acquisition Price ("WAC"), which is set by the
pharmaceutical company (e.g., Mylan) and is a starting point for invoices between
pharmaceutical companies and wholesalers. *See* Schondelmeyer Report ¶¶ 53-56 "List
price" may also refer to the Average Wholesale Price ("AWP"), which is the starting
point for invoices between wholesalers and pharmacies and is a fixed percentage
(typically 20%) above the WAC. *Id.* ¶¶ 53, 57-61.

payments increase by a proportionate amount. *Id. See also* Schondelmeyer Report ¶¶ 58-61.

The list price of the EpiPen increased dramatically during the Class Periods, from less than $100 for a 2-Pak in 2007 to more than $600 by 2016:



Compl. ¶ 54; Schondelmeyer Report ¶¶ 124-33. This rising list price increased the out-of-pocket costs paid by Plaintiffs and each Class member. *See* Compl. ¶¶ 137-49 (citing studies). *See also* Schondelmeyer Report ¶¶ 58-61. For example, between 2007 and 2014, as the EpiPen list price skyrocketed, ***participant deductible and coinsurance payments for EpiPens increased by more than 1,500%.*** Compl. ¶ 9.

The increased EpiPen list price, and thus the increase in participants' out-of-pocket costs, was partially caused by the rebates and fees the PBMs obtained from Mylan. *See, e.g.*, Compl. ¶¶ 104-16 (citing studies). Public studies demonstrate that rebates paid to PBMs accounted for an increasing share of list price increases in recent years: whereas rebates accounted for only 6.5% of list price increases in 2011, they accounted for an astounding 79% of list price increases by 2016. *Id.* ¶ 104.

Dr. Stephen Schondelmeyer, a pharmaceutical economist serving as an expert for Plaintiffs, confirms this trend applied with respect to EpiPens. Schondelmeyer Report ¶¶ 167-71; 213-18; 252-57; 293-98. As time progressed during the relevant Class Periods, the rebates and fees paid by Mylan to the PBMs on each EpiPen ███████████████ ███████████████████████████. *Id.* In January 2016, Mylan's Head of Divisional Finance, Patrick Zinn, reported to Mylan's CEO, Heather Bresch, ██ ███████████████████████████████████████ ██████████████████████████████████████ ████████████. MYERISA-00288923 (PX3). Zinn explained that, ██████████████ ████████████████████████████████████ ███████████████████████████████████████ ████████████████████████. *Id.* (PX3).

Accordingly, Dr. Schondelmeyer ████████████████████████████ ████████████████████████████████████████████. Schondelmeyer Report ¶¶ 29, 213-18; 252-57; 293-98. He further opines that, ██████████ ████████████████████████████████████████ ████████████████████████████████████████. *Id.* ¶¶ 29, 34-35, 59-61.

Finally, even though the PBMs shared certain portions of rebates with their clients, such pass-throughs did not reduce *participants*' deductible or co-insurance payments because, as noted above, participant payments are based on the *list* price and not the *net price* after rebates and fees. *See also* Schondelmeyer Report ¶ 36. In other words, while

the *PBM's clients* (i.e., the entities that hired them) may have paid a lower net price on the portion of the drug price they paid, the *participants* continued to make payments based on the undiscounted, and ever-inflated, list price.

### 7. The PBMs Could Have Used the Rebates and Fees They Received to Lower Participants' Out-of-Pocket Costs.

The PBMs each had the capacity to apply portions of their rebates and fees to reduce participants' out-of-pocket payments at the pharmacy counter. *See, e.g.*, Compl. ¶ 160. *See also* Schondelmeyer Report ¶¶ 30-32, 36. Unfortunately, the PBMs generally failed to implement these "point of sale" ("POS") programs until recently, and only after they faced public scrutiny over rebating practices that had already cost members of the Classes considerably over many years. Even then, the PBMs took steps to limit the scope of their program and continued to keep their portion of rebates and fees for themselves.

ESI has the capacity, through a so-called "Smartshare Rx" program, to apply "an estimated rebate value" to "reduc[e] the patient's out-of-pocket cost at the point of sale."[15] As internal documents describe,



---

[15] *The Rebate Debate*, Express Scripts (June 29, 2017), https://www.express-scripts.com/corporate/articles/rebate-debate.

ES_000239650 at 651 (PX4). CVS likewise has "the capability to reduce members' [out-of-pocket] spending by applying rebates at the point of sale."[16] OptumRx is able "to share discounts funded by drug manufacturer rebates" by applying such discounts "directly to members when they fill prescriptions through … pharmacies."[17] Prime ███████ ████████████████████████████████, *see, e.g.*, Prime0615129 at 130 (PX5).

The PBMs *admit* that sharing rebates at the point of sale would lower participant drug costs. ESI's internal documents ██████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ES_000133406 at 407 (PX6). This document further explained that ████████████ ███████████████████████████████████████████████████████ ████████████████ *Id.* CVS explained that "[o]ur consumer research shows that [out-of-pocket] costs may be a barrier to accessing needed medical care" and that "[a] solution like POS rebates that reduces how much a member has to pay out-of-pocket can help improve adherence."[18] OptumRx explained that discounts applied at the point of sale would "result[] in lower out-of-pocket costs."[19] UnitedHealth announced that its program could "lower[] prescription drug costs for consumers by an average of $130 per eligible

---

[16] Jon Roberts, *Consumer Transparency Helping Members with High-Cost Drugs at the Point of Sale*, CVS Health (June 7, 2017), https://payorsolutions.cvshealth.com/insights/consumer-transparency.

[17] *Insights: Point of sale discounts mean lower costs*, Optum, https://www.optum.com/resources/library/point-of-sale.html (last visited Dec. 10, 2019).

[18] Roberts, *supra* note 16.

[19] *Insights: Point of sale discounts mean lower costs*, *supra* note 17.

prescription."[20] Internal Prime documents reflect that ████████████████

██████████████████████████████████████████████████

████████████████████████ Prime0613749 (PX7).

Despite having the means and conceding the effectiveness, the PBMs generally

did not implement these programs until public scrutiny and litigation in recent years

forced the issue. ██████████████████████████████████ For example,

internal ESI documents from ████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ " ES_000239496 (PX8). And even

when clients specifically asked for it, ESI's ████████████████████████

██████████████████████████████████ *Id.* As late as 2018, ESI made

clear that ████████████████████████████████████████

████████████████████████████████████████████████████

████ ES_000133406 at 407-08 (PX6). As a result, ESI ████████████████

████████████████████████████ *Id.* at 411. In other words, ESI attempted to

██████████████████████████████████████████████████████

██████████████████████████████████ .

CVS also appears to have ████████████████████████████████

██████████████████████████████████████████████████

[20] *Successful Prescription Drug Discount Program Expands to Benefit More Consumers at Point-of-Sale*, UnitedHealth Group (Mar. 12, 2019), https://www.unitedhealthgroup.com/newsroom/2019/2019-03-12-prescription-drug-program-expands-to-benefit-consumers-point-of-sale.html.

█ *See* CM-000302184 at 186 (PX9). *See also* CM-000323919 at 919 (PX10) (████

████████████████████████████████████████████████████████████████

████). Although UnitedHealth began implementing the OptumRx program for all

participants in insured plans effective January 1, 2019, OptumRx and UnitedHealth

continued to leave the choice to employers with respect to employer self-funded plans for

which they provided services.[21] Beginning in 2020, OptumRx and UnitedHealth

announced they would "only support new employer clients that incorporate point-of-sale

discounts to consumers."[22] UnitedHealth conceded that its decision to require the

adoption of such programs was "expected to accelerate adoption of point-of-sale

discounts across all types of commercial business, including self-funded."[23]

Prime ████████████████████████, Prime0613749 (PX7), and, even then,

████████████████████████████. Although it had the capacity to share rebates and

fees with participants at the point of sale, including the portion of rebates and fees it kept

for itself, "Prime's position on POS rebates was ████████████████████████

████████████████████████████████████████ Prime0609877 at

9878 (PX11). When rebates captured national attention in 2018, Prime's VP of

Government Affairs stated that ████████████████████████████████████

████████████████████████████████████████████████████████

████████ *Id.* But in reality, Prime and the other PBMs *also* failed, until very recently,

---

[21] *Insights: Point of sale discounts mean lower costs*, *supra* note 17.
[22] *Successful Prescription Drug Discount Program Expands to Benefit More Consumers at Point-of-Sale*, *supra* note 20.
[23] *Id.*

to give up those dollars to participants and instead continued to collect rebates and fees for themselves, their owners, and other clients despite the fact that those rebates and fees harmed participants and were not being used to lower participant costs.

**B. Facts Demonstrating Common Conduct.**

**1. Each PBM Obtained Rebates and Fees on ERISA Plan Participants' EpiPen Purchases Pursuant to a Common Contract.**

The details of each PBM's rebate and fee contract with Mylan are described below, but they share several basic characteristics. *First*, a single contract, and common ongoing negotiations of amendments thereto, governed the rebates and fees Mylan paid with respect to all EpiPen purchases by all participants in all ERISA plans served by each PBM.[24] *Second*,



. *Third*, the common contract accounted for

*Fourth*, each PBM managed a common program to calculate, invoice, and collect rebates and fees from Mylan on an ongoing basis. *See also* Schondelmeyer Report ¶¶ 20-21, 24-28.

---

[24] Although a small number of PBM clients may have declined to allow their PBM to negotiate such rebates and fees, such outliers are not within the scope of the relevant Classes. *See infra* pp 48-49. As such, when this Memorandum refers to plans served by the PBMs, it refers only to those plans for which the PBM received rebates or fees from Mylan pursuant to its common agreements, as ascertained from objective data produced by the PBMs. *See infra* pp. 51-52.

### a.  A Common Contract Covers All ERISA Plans Served by ESI.

ESI entered into a single rebate and fee agreement with Mylan, pursuant to which

Mylan ███████████████████████████████████████████████████████

██████ ES_000000001 (PX12). "████" is defined to "█████████████████████

█████████████████████████████████████████████████████████████████" of

ESI. *Id.* § I.M. The first iteration of this contract was effective ████████████

███████████████████[25]

Defendant Medco was acquired by ESHC in 2012, and effective ██████████

██████████████████████████████████████████████████████████████

████████████████[26] Prior to ████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████[27] As noted in the

following discussion, the ██████████████████████████████████████████

██████████████



---

[25] Prior to ████████████████████████████████████████████████████████

████████████████████████████████████████████████. *See, e.g.*, MYERISA-
00025740 §§ II.A (██████████████████████████████), II.B (████████████████
████████████████████████████████████████████████████), I.D
(defining "████████"), I.G (defining "████") (PX13); ES_000021491 (PX14) (████
██████████████████████).

[26] *See* MYERISA-00020409 §§ 4 & 5 (PX15).

[27] *See* ES_000000043 §§ II.A, III.G (PX16).

██████████████: The ESI-Mylan contract acknowledges that ████████

███████████████████████████████████████████████

███████████████████████[28] It also contains a ███████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ ES_000000001 § IX.1 (PX12).[29]

ESI ██████████████████████████████████████



ES_000227692 (PX18); *see also* ES_000232349 at 351 (PX19) (████████

███████████████████████████████); ES_000130929 (PX20)

(████████████████████████████████████████████████

██████████████████████████████████).

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

[28] *See* ES_000000001 § IV.D (PX12); MYERISA-00025740 § III.C (PX13).
[29] *Accord* MYERISA-00025740 § VI (PX13); MYERISA-00038129 § VIII.B (PX17).

█████ " ES_000000106 § 1. Ex. A (PX21).[30] A common " ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████ ":



ES_000000001 Ex. A (PX12)[31]; *see also id.* ( █████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████ " *Id.* (PX12).[32] Rebates are calculated by

---

[30] *Accord* MYERISA-00020409 Ex. A (PX15); ES_000000069 Ex. A (PX22); ES_000000087 Ex. A (PX23). *See also* ES_000000043 § IV.A (PX16) ( ████████████████████████████████████████████████████████

████████ ).

[31] *Accord* MYERISA-00020409 Ex. A (PX15); ES_000000069 Ex. A (PX22); ES_000000087 Ex. A (PX23).

[32] *Accord* MYERISA-00020409 Ex. A (PX15); ES_000000069 Ex. A (PX22). *See also* ES_000000129 Ex. A (PX24) ( ███████████████████████████████ ).



█████████████████████████████████████████████████████

████████████████████████████████████████████" *Id.*[33]

      ESI and Mylan also agreed ████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████ *See id.*[34]

Additionally, within this single, common contract, ██████████████████████

███████████████████████[35]

      ***Common Calculation and Invoicing***: ESI "████████████████████[36]

██████████████████████████████████[37] ███████████████

████████████████████████████[38] ████████████████████

██████████████████████████████████████████████████

█████████████████████████,"[39]

---

[33] *Accord* MYERISA-00020409 Ex. A (PX15).

[34] *Accord* MYERISA-00020409 at 415 (PX15); ES_000000069 at 74-75 (PX22).

[35] *See, e.g.*, MYERISA-00280162 at 2 and Attachment 1 (PX25); MYERISA-00021031 (PX26); MYERISA-00020409 Attachment A-1 (PX15); ES_000000106 (PX21).

[36] ES_000000001 § III.B.3 (PX12). *Accord* ES_000021491 § II.D (PX14). *See also* MYERISA-00038129 Ex. A § 3 (PX17) ("████████████████████ ██████████████").

[37] ES_000021491 § II.D (PX14).

[38] ES_000000001 § III.B.3 (PX12).

[39] ES_000000001 § IV (PX12). *Accord* MYERISA-00025740 § II.B (PX13); ES_000021491 § II.D (PX14; MYERISA-00038129 § III.A.1 (PX17) ("████████ ████████████"). *See also* ES_000000043 § IV.B (PX16) (███████████████████████████████████████████ ██████████████████").

***Rebates Were Paid to ESI:*** The rebates █████████████████████████████

█████████████████████████ ES_000000001 § I.R (PX12) ("" █████████

█████████████████████████████████ "); *see also id.* § IV.B

(PX12).[40] ESI then █████████████████████████████. *Id.* § II.E

(PX12).[41]

### b. A Common Contract Covers All ERISA Plans Served by CVS.

CVS entered into a single rebate and fee agreement with Mylan, under which

████████████████████████████████████████," CM-

000000001 § 3(a) (PX27), which are █████████████████████

██████████████████████████████████████████

██████████████" *Id.* § 1 (PX27).[42] Prior to █████████████

████████████████████████████████.[43] The CVS-

---

[40] *Accord* MYERISA-00025740 § II.A (PX13); *id.* § III.C PX13); MYERISA-00020409
Attachment 3 (PX15); MYERISA-00038129 § II.A (PX17) (██████████████
████████████████████").; ES_000000043 § IV.A (PX16) (████████████
██████████████████████").

[41] *Accord* MYERISA-00025740 § III.C (PX13).

[42] *Accord* CVSCM_EPI_000200555 §§ 1, 3(a) (PX28) (███████████████
██████████████████).

[43] *See* MYERISA-00037638 § 2(b) (PX29) ("█████████████████████
███████████████████████"); MYERISA-00037664 §
1 (PX30); MYERISA-00223123 § 2(b) (PX31); MYERISA-00223176 § 3.1 (PX32)
("██████████████████████████████████████
███"); MYERISA-00037707 §§ 1.18 (PX33) (██████████████████
██████), 1.13 (██████████): MYERISA-00223172 ¶ 3 (PX34) (█████
████████████████████████"); CM-000233802 ¶¶ 11, 21
(PX35); MYERISA-00037702 ¶ 2 (PX36).

Mylan contract refers to ███████████████████████████████" CM-000000001 § 1 (PX27) (██████████████████████"). [44] Other CVS documents confirm that ██████████████████████████████████████████████ ████" CM-000220417 (PX37).

Other documents confirm that ████████████████████████ ██████████████████████████████████ ████████████████████████████████████████████████" MYERISA-00033573 (PX38). ████████████████████████████ ████████████████████████████████████████████ ████████████████████████" MYERISA-00123823 at 824-25 (PX39). A subsequent internal Mylan email ██████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████." *Id.* at 824. Subsequent internal CVS emails acknowledged that ████████████████ ██████████████████████████████████████████ ██████ CM-000038393 (PX40).

████████████████: The CVS-Mylan contract ██████████████████ ██████████████████████████████, CM-000000001 § 2(b) (PX27), [45]

---

[44] *Accord* CVSCM_EPI_000200555 § 1 (PX28); *see also* MYERISA-00037707 at 1, ¶ 3 (PX33) (██████████████████████████████████████████).

[45] *Accord* CVSCM_EPI_000200555 § 2(b) (PX28); MYERISA-00037707 § 3.4.1(PX33) (PCS).

and contains ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████. *Id.* § 4(g).[46]

          ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████[47]██████████████████████

████████████████████████████████████████████

████████████[48]██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████[49]████████████████

████████████████████████████

---

[46] *Accord* CVSCM_EPI_000200555 § 4(g). *See also* MYERISA-00037664 § 9 (PX30) (Caremark).

[47] Caremark: MYERISA-00037638 ¶ 2 & Ex. B; MYERISA-00223123 ¶ 3 (PX31); MYERISA-00027991 at 994 (PX41); MYERISA-00037647 Ex. B (PX42). PCS: CM-000233802 ¶ 27 (PX35); MYERISA-00223176 ¶ 8 (PX32), MYERISA-00037707 Ex. B (PX33).

[48] *See, e.g.*, MYERISA-00037658 Ex. B (PX43) (██████████████); MYERISA-00037702 Ex. B (PX36) (████████████).

[49] *See* CVSCM_EPI_000200555 Ex. D (PX28).



CM-000000001 Ex. D § B (PX27) (████████████████).[50]

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████. CM-000000001 Ex. D § I (PX27).[51]

***Common Calculation and Invoicing***: CVS agreed to ████████████

███████████████████████████████████████████." CM-

000000001 § 3(c) (PX27).[52] CVS further agreed to ████████████████

████████████████████"[53] Accordingly, CVS provided Mylan with ████████

---

[50] *See also* CVSCM_EPI_000200555 Ex. D. § A (PX28).
[51] *Accord* CVSCM_EPI_000200555 EX. D § G (PX28). Caremark Contract; MYERISA-00037638 Ex. B (PX29); MYERISA-00027991 at 994. (PX41); MYERISA-00037647 Ex. B (PX42); MYERISA-00037658 Ex. B (PX43). PCS Contract: MYERISA-00037707 Ex. B (PX33); CM-000233802 ¶¶ 26, 27 (PX35); CM-000233841 Ex. B (PX44); MYERISA-00037692 Ex. B (PX45); MYERISA-00037702 Ex. B (PX36).
[52] *Accord* CVSCM_EPI_000200555 § 3(c) (PX28); MYERISA-00037707 § 2.2 (PX33) (PCS Contract).
[53] CM-000000001 § 3(c) (PX27); *id.* § 3(d) (PX27) (describing "████████████████"). *Accord* CVSCM_EPI_000200555 §§ 3(c), (d) (PX28); MYERISA-00037664 § 2(c) (PX30) (Caremark Contract); MYERISA-00037707 § 2.3 (PX33) (PCS Contract).



.[54]

***Rebates Were Paid to CVS***: The contract provided that "█████████████████████████████████████████████████████████" CM-000000001 § 3(a).

*Accord id.* Ex. D. § K (PX27).[55] █████████████████████████████

█████[56] *See also* CM-000214879 (PX48) ("█████████████████████

██████████████████████████████████████████████████████████

███████").

### c.   A Common Contract Covers All ERISA Plans Served by OptumRx.

████████████████████[57] ████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████[58] OptumRx entered into this contract "█████

████████████████████[59] █████████████████████████████████████

████████████████████[60] Mylan "████████████████████████████████

---

[54] *See* MYERISA-00007108 at 114-15 (PX46).

[55] *Accord* CVSCM_EPI_000200555 § 3(a) Ex. D § I (PX28). Caremark Contract: MYERISA-00037664 § 2(d) (PX30); MYERISA-00037638 § 2(b) (PX29); MYERISA-00223123 § 2(b) (PX31); MYERISA-00037647 § 2(b) (PX42); MYERISA-00037658 § 2(d) (PX43); MYERISA-00223146 § 2(d) (PX47). PCS Contract: MYERISA-00223176 § 3.1 (PX32); CM-000233802 ¶ 21(PX35); MYERISA-00037702 ¶ 2 (PX36).

[56] CM-000000001 § 3(c) (PX27); CVSCM_EPI_000200555 § 3(c) (PX28); MYERISA-00223176 § 2.6 (PX32) (PCS).

[57] In 2010, OptumRx was known as Prescription Solutions. *See, e.g.*, EPI-0000029 at 1 (PX49).

[58] EPI-0000001 at 1 (PX50).

[59] EPI-0000029 at 1, § B (PX49).

[60] "███████████████████████████████████████████████████████████



███████████████████████████████████████████

███████████████████████████████.,61 "█████████████

███████████████████████████████████████

█████62

████████████████████████████████, UnitedHealth

used OptumRx as its PBM. Thereafter, ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████63

█████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████64

███████████████████████████████████████

█████████████████████████████████████65

---

██████████████████" EPI-0000001 § 1.5 (PX50). *See also id.* § 3.2.1 & Ex. B
(PX50) (███████████████████). OptumRx ████
████████████████████████████████  EPI-0000029
§ 4.1. (i) (PX49).

[61] EPI-0000001 at 1 (PX50).

[62] *See* EPI-0000001 § 1.13 (PX50) (████████████████████
████████████); *id.* § 1.4 (PX50) (█████████████
██████████████████████████); *id.* § 1.3 (PX50) (█████
███████████████████████████████). *Accord* EPI-0000029 §
2.1.1 (PX49); EPI-0000054 § 2.1.1 (PX51).

[63] MYERISA-00056879 at 883 (PX2).

[64] EPI-0000001 Ex. A § 2 (PX50).

[65] EPI-0000029 Ex. A at 039-41 (PX49).



[66] The following example shows rebate rates applicable during 2015 and 2016:

EPI-0000069 Ex. A § 5.A.i (PX53); *see also id.* Ex. A § 1 (████████████ ████████████).

Total OptumRx rebates are calculated using ████████████ ████████████████████████████████████████████ ████████████████████████).”[67]

---

[66] EPI-0000045 Ex. A §§1, 2, 5.A (PX52); EPI-0000054 Ex. A §§ 1, 2, 5.A (PX51); EPI-0000069 Ex. A §§ 1, 2, 5.A (PX53); MYERISA-00035795 § D (PX54); MYERISA-00035798 Ex. A §§ 1, 2, 5.A (PX55); MYERISA-00035807 Ex. A §§ 1, 2, 5.A (PX56); MYERISA-00040310 Ex. A §§ 1, 2, 5.A (PX57); MYERISA-00186064 Ex. A §§ 1, 2, 5.A (PX58).

[67] EPI-0000045 Ex. A § 2 (PX52); *accord* EPI-0000054 Ex. A § 2 (PX51); EPI-0000069 Ex. A § 2 (PX53); MYERISA-00035798 Ex. A § 2 (PX55); MYERISA-00035807 Ex.

***Common Calculation and Invoicing***: OptumRx agreed to ███████████
███████████████████████████████████████████████████████████ ."[68] OptumRx

also provided Mylan with ████████████████████████████████████

██████ .[69]

***Rebates Were Paid to OptumRx***: The rebates ████████████████████
███████████████████████████████████████████ . *See, e.g.*, EPI-0000001§ 2.2.1

(PX50) ("████████████████████████████████████████████████

████████████████ ").[70]

### d.  A Common Contract Covers All ERISA Plans Served by Prime.



████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████" Prime0000001 §§ 1.n, 5 (PX60). "████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████"[71]

A § 2 (PX56); MYERISA-00040310 Ex. A § 2 (PX57); MYERISA-00186064 Ex. A § 2 (PX58).

[68] EPI-0000029 § 3.4.5 (PX49). *See also* MYERISA-00011561 at 565 (PX59) (████ ██████).

[69] EPI-0000029 § 2.1.1 (PX49). *Accord* EPI-0000054 § 2.1.1 (PX51).

[70] *Accord* EPI-0000029 § 2.2.1 (PX49); EPI-0000054 § 2.2.1 (PX51).

[71] Prime0000022 § 1.i (PX61). *See also* Prime0000001 § 1.i (PX60) (similar definition).

██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████," [72]

Internal documents confirm that ███████████████████████████

████████████. For example, ██████, Prime's Senior Director for Specialty Trade

Relations and Procurement ████████████████████████████████████, explaining

that ████████████████████████████████████████████████████."

Prime0017326 (PX63); *see also* Prime0022848 (PX64) (████████████████████████

████████████████████████████). In another email, employees of Blue

Cross Blue Shield of North Carolina responded to ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████" Prime0072876 at 878 (PX65).

Prime's Senior Director, Trade Client Services, responded: "██████████████████████

████████" *Id.* at 877.

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

[72] Prime0000001 § 6.i (PX60). Prime periodically provides Mylan a list of its Clients.
Prime0000022 § 3.a (PX61); Prime0000031 § 3.a (PX62).



Prime0000041 Ex. C (PX67) (█████████████████████████████).[75]

Total rebates were calculated █████████████████████████████

██████████████████████████████████"[76]

***Common Calculation and Invoicing:*** Prime agreed to ████████████

██████████████████████████████████████████████████████████

████████[77]

---

[73] Prime0000001 § 2.a, Ex. C (PX60). *Accord* Prime0000019 Ex. C (PX66); Prime0000022 Ex. C (PX61).

[74] Prime0000031 Ex. C (PX62).

[75] *See also* Prime0000045 Ex. C (PX68); Prime0000048 Ex. C (PX69).

[76] Prime0000022 Ex. C (PX61). *Accord* Prime0000031 Ex. C (PX62); *see also* Prime0000001 Ex. C (PX60); Prime0000041 Ex. C (PX67); Prime0000045 Ex. C (PX68); Prime0000048 Ex. C. (PX69); Prime0022111 EX. C (PX70).

[77] Prime0000022 § 2.c (PX61); *see also id.* Ex. D (PX61); Prime0022111 Ex. D (PX70) (████████████████████████████████████████████████████████."). *See also* MYERISA-00288188 at 191 (PX71(██████████████████████).

***Rebates Were Paid to Prime***: Mylan paid the rebates ███████████ ██████████████████████████████████████. Prime0000022 § 2.e (PX62) (████████ ████████████████████████████). Prime ████████████████████████████████ ████. *See, e.g.*, Prime0000001 § 3.g (PX60) ("████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████").

### 2. Each PBM Obtained Increased Rebates Through Common Negotiations.

***ESI***: ███████████████████████████████████████████████████████████ █████████████████████████████████████████[78] ███████████████████████ ███████████████████████████████████████████████████████████████████ ███████████.[79]

With respect to the Medco-Mylan contract, ██████████████████████████ ███████████████████████████████████████████████████[80] Effective ████████████████, Medco negotiated—███████████████████████████████ ███████████████████████████████████████████████████████████████████.[81]

---

[78] *Compare* MYERISA-00025759 at Schedule 1 (PX72), *with* MYERISA-00025740 Attachment 1 (PX13), MYERISA-00280110 (PX73); MYERISA-00280103 (PX74); MYERISA-00025727 (PX75); MYERISA-00280162 (PX25).
[79] MYERISA-00021031 Attachment A-1 (PX26); MYERISA-00021040 Attachment A-1 (PX76).
[80] ES_000000043 Ex. A (PX16); ES_000000053 Ex. A (PX77).
[81] ES_000000137 ¶¶ 2, 4 & Ex. A (PX1).



[84] *See also* Schondelmeyer Report, Figure 10, ¶ 174.

**CVS:**

---

[82] ES_000000129 Ex. A (PX24).

[83] MYERISA-00046278 Attachment A-1 (PX78).

[84] MYERISA-00038110 Attachment A-1 PX79).

[85] *Compare* MYERISA-00223114 Ex. B (PX80), *with* MYERISA-00037638 Ex. B (PX39).

[86] *Compare* MYERISA-00223172 ¶ 13 (PX34), *with* MYERISA-00223176 ¶ 8 (PX32).

, *see infra* notes 109 & 112.

[87] MYERISA-00037658 Ex. B (PX43); MYERISA-00037702 Ex. B (PX36).

[88] MYERISA-00037658 Ex. B (PX43); MYERISA-00037702 Ex. B (PX36).



Report, Figure 15, ¶ 220.

*OptumRx***:** OptumRx and Mylan initially agreed ▮▮▮▮▮▮▮

Figure 20, ¶ 259.

---

[89] CVSCM_EPI_000200555 Ex. D § A (PX28).

[90] CM-000063261 Ex. D § A (PX81).

[91] CVSCM_EPI_000035450 Ex. D § I (PX82).

[92] *Id.* § B-1 (PX82).

[93] CVSCM_EPI_000112931 (PX83).

[94] EPI-0000001 Ex. A § 3 (PX50).

[95] EPI-0000045 Ex. A § 5.A.i (PX52).

[96] EPI-0000069 Ex. A § 5.A.i (PX53).

***Prime***: The Prime-Mylan contract initially ███████████████████

███████████████[97]█████████████████████████████

████████████████████████████████████████

███████████████████████████████████████[98]

████████████████████████████████████████████

██████████████████████[99]█████████████████████

███████████████████████████████████████

█████████████████████[100] *See also* Schondelmeyer Report, Figure 25,

¶ 300.

### 3. Each PBM Obtained Additional Forms of "Rebates" Under Its Common Contracts.

████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████.[101] In other

words, as the EpiPen WAC increased, ████████████████████

██████████████████████████████████████████

████████████████████████████████████[102]



---

[97] Prime0000001 § 2.a, Ex. C (PX60). *Accord* Prime0000019 Ex. C (PX66);
  Prime0000022 Ex. C (PX61).
[98] Prime0000031 Ex. C PX62.
[99] Prime0000041 Ex. C (PX67); Prime0000045 Ex. C (PX68).
[100] Prime0000048 Ex. C (PX69).
[101] MYERISA-00020409 § 6 & Attachment 3 (PX15).
[102] ███████████████████████████████████████ *See* MYERISA-
  00038129 at 1 & Ex. A §§ 1, 2.b, 2.e (PX17).

███████████████████████████████████ [103] ██████████ [104] ███

███ [105]

ESI and Mylan also agreed to a *quid pro quo*, under which Mylan would ████

███████████████████████████████████████████████████████████

██████████████████████



In exchange, when "████████████████████████████████████████████

█████████████████████████████████████████████ [107]

---

[103] CM-000063261 Ex. D § F (PX81); CM-000000001 Ex. D § H (PX27); *See also* CM-000220417 at 6 (PX37) (███████████████████████████████).

[104] EPI-0000069 Ex. A § 4 (PX53) (██████████████████████████████ ████████████). *Accord* EPI-0000045 Ex. A § 4 (PX52); EPI-0000054 Ex. A § 4 (PX51); MYERISA-00035798 Ex. A § 4 (PX55); MYERISA-00035807 Ex. A § 4 (PX56); MYERISA-00040310 Ex. A § 4 (PX57); MYERISA-00186064 Ex. A § 4 (PX58).

[105] Prime0000041 Ex. C § 4 (PX67); Prime0000045 Ex. C § 4 (PX68); Prime0000048 Ex. C § 4 (PX69).

[106] ES_000000106 Ex. A (PX21); *see also* ES_000000069 Ex. A (PX22).

[107] ES_000000106 Ex. A (PX21); *compare id.* Attachments A-1 & A-2 (PX21), *with id.* Attachments A-3 & A-4 (PX21); *compare* ES_000000001 Attachments A-9 & A-10 (PX12) *with id.* Attachments A-11 & A-12 (PX12). *See also* ES_000000069 Ex. A (PX22); ES_000000087 Ex. A (PX23).

Similarly, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████.[108]

### 4. Each PBM Obtained a Separate, Common Administrative Fee on EpiPens Purchased by Plan Participants.

In addition to rebates, each PBM obtained, as a provision in its common contract

with Mylan, █████████████████████████████████████████████████████

██████████████████████████████████████████████████████.[109]

*See also* MYERISA-00013512 at 3 (PX85) (Internal Mylan document explaining that ██

███████████████████████████████").  Each PBM also obtained ████████████

███████████████████████████████████████████████████████████

████████████████[110] Mylan documents explain that "████████████████████████

---

[108] CM-000063261 Ex. D § A (PX81).
[109] ES_000021491 § III (PX14) (████████████████████████████████████████

████████████████████████"); ES_000000001 § III (PX12); CM-
000000001 § 3(b), Ex. D § J (PX27) (████████████████████████████████████████

██████████████████████████████████);
CVSCM_EPI_000200555 § 3(b), Ex. D. § H (PX28) (same); MYERISA-00037707 Ex.
C (PX33) (same); CM-000233802 Ex. C (PX35) (same); MYERISA-00037692 Ex. C
(PX45) (same); Prime0000022 § 2.b (PX61) (███████████████████████████████

████████████████████); EPI-0000029 §§ 2.1.1, 2.2.1, Ex. A § 3 (PX49) (███████████

█████████████████████████████████████████████████████████"); EPI-
0000045 Ex. A §§ 3, 5 (PX52) (same); EPI-0000054 Ex. A §§ 3, 5 (PX51) (same); EPI-
0000069 Ex. A §§ 3, 5 (PX53) (same).
[110] *Compare* ES_000021491 § III.A (PX14), *and* MYERISA-00025758 (PX84), *with*
ES_000000001 § III.A (PX12). ███████████████████████████████████████████

██████████████████████.  *See* ES_000000043 § V.A (PX16);
ES_000000137 ¶ 9 (PX1).



███████████████████████████████████"[111] ███████████████████████

███████████████████████████.[112] ████████████████████████████

████████████████████████[113] *See also* Prime0002282 (PX87) (████

████████████████████████████████████████████████████████████

████████████████████████████"); Prime0008247 at 248 (PX88) (Prime

email to Mylan stating, ███████████████████████████████████

██████████████████). *See also* Schondelmeyer Report, ¶¶ 174-75, 220-21, 300-01.

████████████████████████████████████████████

████████████████████████████████████████████████████████[114]

Internal Mylan emails reflect that "██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████"[115] *See also* Schondelmeyer Report, ¶¶ 260-61.

Internal documents suggest that ████████████████████████████

████████████████████████████" OPTUMRX-EPI 00493968 at 986 (PX90).

---

[111] MYERISA-00013512 at 1 (PX85). *Accord* MYERISA-00038194 at 2 (PX86).
[112] *Compare* MYERISA-00037692 Ex. C (PX45), *with* MYERISA-00037702 Ex. C (PX36).
[113] *Compare* Prime0000001 Ex. D (PX60), *with* Prime0022111 Ex. D (PX70).
[114] *Compare* EPI-0000069 Ex. A § 5.A.i (PX53), *with* MYERISA-00035795 Ex. A § 5.A.i (PX54).
[115] MYERISA-00012934 at 937 (PX89). *Accord* MYERISA-00013512 at 4 (PX85).

**5. The PBMs Leveraged Their Relationships with All Plans They Served to Obtain Greater Rebates and Fees.**

According to the PCMA, the PBM's trade organization, "[b]ecause PBMs aggregate the purchasing power of individual insurers/employers, they often obtain better terms than insurers/employers could alone." *Rutledge* BIO at 4. Each PBM aggregated the bargaining power of the thousands of plans it served, not to benefit plan participants, but instead to obtain greater rebates and fees from pharmaceutical companies, including Mylan.

ESI " ██████████ " ███████████████████████████

████████████████████████████████████



ES_000098962 at 963 (PX91). While these efforts may have reduced the net prices paid by certain *clients*, the rebates and fees did not benefit—and, in fact, increased the prices paid by—plan *participants*, as explained *supra* pp. 9-12.

OptumRx similarly used all of the plans it served as leverage to obtain rebates and fees. ███████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████

MYERISA-00056879 at 2 (PX2); *see also* MYERISA-00056878 (PX92) (█████
███████████████████████). Mylan documents reflect how █████████████

38

███████████████████████████████████████████████

████████████████████████.” MYERISA-00013972 (PX93).

CVS recognized that its large book of business gave it ████████████████████

████████████████████████████████” CM-000106606 (PX94). ██████████

CVS informed Mylan that ███████████████████████████████

████████████” MYERISA-00232129 (PX95). In discussing █████████ internally,

Mylan recognized that CVS was "████████████████████████████████

████████.” *Id* (PX95).

Prime's "████████" for rebate contracting was that "██████████████████

███████████████████████████████████████████

████████████████.” Prime0557062 (PX96). This contracting strategy

included "████████████████████████████████████████

████████████████████” *Id.* at 063 (PX96).

The collective-bargaining tactics of the PBMs allowed them to capture larger

rebates and fees. In contrast to the █████████ rebates the PBMs obtained in 2016, *see*

*supra* pp. 31-34, Mylan paid only █████ rebates to a smaller insurer that same year.

MYERISA-00013448 at 350 (PX97). Mylan's Director of Finance, Christopher Phillips,

responded by suggesting that Mylan in the future could "████████████████████

████████████████████████████" *Id.* at 448

(PX97). However, Phillips acknowledged that "████████████████████████

████████████████," *id.* (PX97), ████████████████████

████████████, *see supra* pp. 18, 22-23, 25-26, 29. One Mylan senior regional

account manager responded by remarking how "████████████████

████████████████████████████████████████████

████████████████████████████ " MYERISA-

00013448 (PX97).

**6. The PBMs Exchanged Formulary Placement for Higher Rebates and Fees.**

The PBMs also ████████████████████████████

████████████████████████████████████████

████ . For example, ████████ , Mylan Specialty's President, Roger Graham,

emailed Mylan CEO Bresch reporting that ████████████████████████

████████████████████████████████████████

████████████████ ." MYERISA-00276570 (PX98). ESI "████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ " *Id.* (PX98). Subsequently, Mylan agreed to ████████████

████████████████████████████ . Specifically, ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ MYERISA-00038110 Attachment A-1 (PX79).

CVS likewise ████████████████████████████████

████████████ . For example, in response to ████████████████

████████████████████████████████████████

██████████████████████. MYERISA-00037726 at 4 (PX99). ████████████, CVS

emailed Mylan stating it █████████████████████████████████████████

█████████" MYERISA-00040309 (Timeline) (PX100). ████████████ CVS

successfully obtained ███████████████████████████████████████

██████████████████████████████████████████; CVS also obtained its

desired ████████████████████████████████████████████████████

██████████████████████████[116]

███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████." MYERISA-

00018208 (PX102). ████████████, within the context of Mylan's ongoing rebate

negotiations with Optum, UnitedHealth ████████████████████████████

███████████████████████████████████████████████

██████████████████████████████." OPTUMRX-EPI 00054031 (P103).

Mylan responded that █████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████" *Id.* (PX103). ████████████████████

████████████████████████████████████████████████

---

[116] *Compare* CVSCM_EPI_000200541 Ex. D § A (PX101), *with* CM-000063261 Ex. D § A (PX81).

██████████████████████████████████████████████████[117] In conjunction with

this change, Mylan's Director of National Accounts acknowledged that "████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████" MYERISA-00057327 at

329 (PX104).

Prime used similar tactics. For example, in a ██████ email to Mylan confirming

their prior discussions, Prime's Manager of Pharm Contracts, Amy Olson, explained that

"████████████████████████████████████████████████████████

██████████████████████████████" Prime0017547 (PX105). Olson emphasized

that "████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████" *Id.* (PX105). However, Olson made a

proposal: "████████████████████████████████████████████████████

██████████████████████" *Id.* at 548 (PX105). Later that year, Prime and Mylan agreed to

██████████████████████████████████████████████████████████

██████████. *See supra* p. 34.

### 7. The PBMs Did Not Disclose their Rebate and Fee Agreements to Plan Participants.

The PBMs did not disclose the existence or amount of the rebates and fees they

received to the ERISA plan participants whose EpiPen purchases generated those rebates

---

[117] *Compare* EPI-0000029 Ex. A § 4.A (PX49), *with* EPI-0000045 Ex. A §§ 4, 5.A
(PX52). *See also supra* pp. 33-34.

and fees. *See* Compl. ¶¶ 71, 157-70. In fact, CVS, ESI, and OptumRx each ██████

████████████████████████████████████████████████ [118]

### III.   CLASS CLAIMS

Plaintiffs allege that the PBMs are fiduciaries with respect to their plans and the thousands of other ERISA plans for which the PBMs provide pharmacy benefit management services. *E.g.*, Compl. ¶¶ 171-86. Plaintiffs further allege that, in exercising their fiduciary authority, the PBMs breached the fiduciary duties they owed to Plaintiffs and the Class members. *Id.* ¶¶ 187-201; 228-36. Plaintiffs seek to enjoin Defendants' ongoing breaches and obtain other "appropriate equitable relief," 29 U.S.C. § 1132(a)(3), including monetary relief in the form of disgorgement and surcharge. Compl. ¶¶ 235-36 & § VIII (Prayer for Relief).

**Fiduciary Status:** ERISA imposes a functional test for fiduciary status, under which an entity is a fiduciary if, *inter alia*, it (1) "exercises any discretionary authority or discretionary control respecting management of such plan," or (2) "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). As their self-ascribed moniker implies, the PBMs *manage* pharmacy benefits for health plans, including ERISA plans.

---

[118] ES_000000001 § VII (PX12) (████████████████████); MYERISA-00025740 § V (PX13) (████████████████████████); ES_000021491 § VI (PX14) (████████████████████████); ES_000000043 § VI (PX16) (████████████████); CM-000000001 § 5 (PX27) (████████████); CVSCM_EPI_000200555 § 5(a) (PX28) (same); MYERISA-00037664 § 3(a) (PX30) (████████████████); MYERISA-00037707 § 5 (PX33)(████████████); EPI-0000001 § 6.1 (PX50) (████████████████).

More specifically, the PBMs exercised discretionary control or authority over plan "management" or "administration" in at least three ways relevant to the conduct at issue. *First*, the PBMs exercised ongoing, discretionary control over the conditions for EpiPen purchases to be covered by ERISA plans. Specifically, ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████. *E.g.* Compl. ¶¶ 71-79, 97-103, 182-83. *See supra* pp. 16-31.

*Second*, the PBMs exercised discretionary control over the amounts participants were required to pay in order to purchase EpiPens with coverage under their ERISA plans. *See In re EpiPen ERISA Litig.*, 341 F. Supp. 3d 1015, 1019 (D. Minn. 2018) (plaintiffs plausibly alleged fiduciary status based, *inter alia*, on their allegation that "confidential agreements between Defendants and Mylan[,] … affected the price they paid for EpiPens."). The PBMs controlled participant payment amounts in three related ways: (i) they negotiated and collaborated with Mylan to obtain ever increasing rebates and fees that were a cause of the rise in the EpiPen list price, from which participant cost-sharing payments are derived; (ii) they failed to negotiate a lower list price; and (iii) they failed to use the rebates and fees they received to benefit participants, including by providing direct price relief at the point of sale. Compl. ¶¶ 6-8, 104-25, 132, 140-48, 179, 183. *See also In re EpiPen ERISA*, 341 F. Supp. 3d at 1019 (Plaintiffs plausibly alleged that "fiduciary relationship stems … from the PBM's actions that line [their] own pockets at the expense of plan participants"); *id.* at 1020 ([P]laintiffs plausibly alleged "the

claimed arms'-length bargaining between Defendants and Mylan was in fact a concerted effort to raise the price for EpiPens, *increasing profits for both Defendants and Mylan* but injuring Plaintiffs in the process.").

*Third*, the PBMs were fiduciaries because they exercised discretionary control over the amounts of compensation they received by virtue of their positions as service providers to ERISA plans. *See, e.g.*, *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987) (A service provider to ERISA plans that possesses "control over factors that determine the actual amount of its compensation" is a fiduciary "with respect to that compensation."); *In re EpiPen ERISA*, 341 F. Supp. 3d at 1020 ("Plaintiffs here have sufficiently alleged that Defendants had discretion to determine the amount of their compensation …."). The PBMs controlled the amounts of their compensation in two related ways: (i) by negotiating and collaborating with Mylan to obtain ever increasing rebates and fees; and (ii) by manipulating categories of payments—e.g., swapping "administrative fees" for rebates—to avoid or minimize obligations to share monies with their clients. *See, e.g.*, Compl. ¶¶ 6-8, 71-79, 97-103, 157-70, 178-79, 184; *see also In re EpiPen ERISA*, 341 F. Supp. 3d at 1019 ("Plaintiffs have plausibly alleged that Defendants control the amount they receive in rebates or other fees from Mylan and likewise exercise discretion over how much of that money is paid to the plans.").

**Breaches of Fiduciary Duties:** ERISA imposes fiduciary duties of loyalty and prudence. The duty of loyalty requires that "a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants*" and "for the exclusive purpose of: (i) providing benefits to participants … ; and (ii) defraying reasonable expenses of

administering the plan." 29 U.S.C. § 1104(a)(1). The duty of prudence requires a fiduciary to act "with the care, skill, prudence, and diligence … that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* The PBMs breached these duties in at least six ways. *See* Compl. ¶¶ 228-36.

*First*, the PBMs failed to act "*solely* in the interest" of participants because they used their positions as plan benefit managers to obtain, for the PBMs' *own* benefit, rebates and fees paid on EpiPen purchases by plan participants. *E.g.*, Compl. ¶¶ 194-95, 228-30.

*Second*, the PBMs' efforts to obtain rebates and fees—whether retained for their own benefit or shared with clients—violated their fiduciary duties because a loyal and prudent fiduciary in similar circumstances would have known those rebates and fees increased the EpiPen list price and thus increased participants' out-of-pocket payments. *E.g.*, Compl. ¶¶ 160, 195, 199, 201, 230.

*Third*, the PBMs breached their duties by failing to use the rebates and fees they did receive to lower the costs paid *by participants*, including through point-of-sale rebate sharing programs. *See, e.g.*, Compl. ¶¶ 8, 144, 160, 198-201, 222, 224, 228-30. *See supra* pp. 12-16.

*Fourth*, by agreeing with Mylan to receive rebates and fees calculated as a percentage of the EpiPen list price, the PBMs created an inherent conflict of interest: because the rebates and fees were a percentage of the list price, and thus increased whenever the list price increased, the PBMs pitted their own interest in higher

compensation directly against the interests of the participants in lower drug costs. A loyal and prudent fiduciary in a similar position would not have agreed to compensation calculated as a percentage of drug list prices. *See, e.g.*, Compl. ¶¶ 75, 102, 142, 188, 195-201, 230, 232. *See also* Schondelmeyer Report ¶¶ 34, 98-103, 160-63, 203-06, 243-46, 284-87.

*Fifth*, the PBMs breached their duties of loyalty and prudence by failing to take any reasonable efforts to negotiate a *lower* list price in lieu of rebates and fees. *E.g.*, Compl. ¶¶ 8, 108-16, 201, 228-30.

*Finally*, the PBMs breached their duties of loyalty and prudence by failing to disclose to participants material information about their benefits, including the amounts of rebates and fees and the impact of such rebates and fees on participants' EpiPen payments. Compl. ¶¶ 157-70, 200, 231.

***Relief Sought***: ERISA authorizes plan participants like Plaintiffs to file suit to "enjoin any act or practice" that violates ERISA, including ERISA's fiduciary duties, and to "obtain other appropriate equitable relief to (i) redress such violations or (ii) to enforce any provisions" of ERISA. 29 U.S.C. § 1132(a)(3). Plaintiffs seek to prevent ongoing and future injuries by enjoining Defendants' disloyal and imprudent conduct. *See* Compl. ¶¶ 235-36 & § VIII (Prayer for Relief). Plaintiffs further seek equitable monetary relief, including (i) disgorgement of the rebates and fees retained by the PBMs on all EpiPen purchases by ERISA plan participants; and (ii) surcharge to recover the excess amounts of cost-sharing payments Class members paid as a result of Defendants' fiduciary breaches. *Id.* The specifics of these remedies are addressed *infra* at pp. 66-72.

47

## IV.   CLASS DEFINITIONS

Subject to the exclusions set forth below, Plaintiffs move the Court for an order certifying the following four plaintiff classes (collectively, the "Classes"):

### A.  The "ESI Class"

Plaintiff Emil Jalonen, as personal representative of the estate of Leah Weaver, seeks to represent the following class:

> All current or former participants in, or beneficiaries of, any ERISA-
>
> covered health benefit plan ("ERISA Plan") who, at any time between
>
> January 1, 2007 and the present, paid a deductible and/or percentage
>
> coinsurance payment for one or more EpiPen(s)[119] processed through their
>
> ERISA Plan(s) for which ESI received from Mylan, on behalf of itself or a
>
> client, a rebate or other fee.[120]

### B.  The "CVS Class"

Plaintiff Emil Jalonen, as personal representative of the estate of Leah Weaver, seeks to represent the following class:

> All current or former participants in, or beneficiaries of, any ERISA Plan
>
> who, at any time between January 1, 2007 and the present, paid a

---

[119] "EpiPen" refers to the drugs identified by the following National Drug Codes ("NDC"): 49502-0500-01 (EpiPen single pack); 49502-0501-01 (EpiPen Jr. single pack); 49502-0500-02 (EpiPen 2-Pak); 49502-0501-02 (EpiPen Jr. 2-Pak).

[120] ██████████████████████████████████████████████████████ *See supra* p. 17. The proposed start date of January 1, 2007 reflects the beginning of the date range for documents and data produced by Defendants in this matter.

deductible and/or percentage coinsurance payment for one or more

EpiPen(s) processed through their ERISA Plan(s) for which CVS received

from Mylan, on behalf of itself or a client, a rebate or other fee.[121]

## C.  The "OptumRx Class"

Plaintiff Susan Illis seeks to represent the following class:

All current or former participants in, or beneficiaries of, any ERISA Plan

who, at any time between April 1, 2010 and the present, paid a deductible

and/or percentage coinsurance payment for one or more EpiPen(s)

processed through their ERISA Plan(s) for which OptumRx received from

Mylan, on behalf of itself or a client, a rebate or other fee.[122]

## D.  The "Prime Class"

Plaintiffs Elan and Adam Klein seek to represent the following class:

All current or former participants in, or beneficiaries of, any ERISA Plan

who, at any time between January 1, 2007 and the present, paid a

deductible and/or percentage coinsurance payment for one or more

EpiPen(s) processed through their ERISA Plan(s) for which Prime received

from Mylan, on behalf of itself or a client, a rebate or other fee.[123]

---

[121] ███████████████████████████████████████████████
████████  *See supra* p. 21. The January 1, 2007 start date reflects the beginning of
the date range for documents and data produced by Defendants.
[122] ████████████████████████████████████████ *See supra* p. 25.
[123] █████████████████████████████████████ *See supra* p. 28.

**Class Exclusions:** Excluded from each of the Classes are the officers, directors, and management of Defendants and their subsidiaries and affiliates.

## V.     ARGUMENT

### A.  The Legal Standard for Certification

"A class action serves to conserve the resources of the court and the parties by permitting an issue that may affect every class member to be litigated in an economical fashion." *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 477 (8th Cir. 2016). When presented with a motion for class certification, a district court must determine that the class (1) is ascertainable, *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016); (2) meets the four prerequisites of Rule 23(a); and (3) meets one of the three requirements of Rule 23(b). The district court has broad discretion in making these determinations, *Ebert*, 823 F.3d at 477, and "class certification is not the time to address the merits of the parties' claims and defenses." *Elizabeth M. v. Montenez*, 458 F.3d 779, 786 (8th Cir. 2006). Nevertheless, the "district court must undertake a rigorous analysis to ensure that the requirements of Rule 23 are met." *Sandusky*, 821 F.3d at 998. Here, a rigorous analysis reveals that the proposed Classes are ascertainable and meet the requirements of Rule 23.

### B.  The Classes Are Ascertainable.

A class is ascertainable "when its members may be identified by reference to objective criteria." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017). For example, although a class of people "who because of their poverty are unable to pay for utility services" is not ascertainable because it is too subjective, *Ihrke v. N. States Power*

*Co.*, 459 F.2d 566, 573 n.3 (8th Cir. 1972), *vacated due to mootness*, 409 U.S. 815

(1972), a class of persons who received specified faxes from a defendant is ascertainable

because "fax logs showing the numbers that received each fax are objective criteria that

make the recipient clearly ascertainable." *Sandusky*, 821 F.3d at 997.

The ascertainability requirement does not require exact precision. In *Sandusky*, the

objective criteria—the fax logs—satisfied the ascertainability requirement even though

they were somewhat overinclusive in that they included fax recipients who did not have

rights under the TCPA. *Id.*; *see also McKeage*, 847 F.3d at 999 (discussing *Sandusky*).

The court held that any over-inclusiveness in the *Sandusky* definition could be rectified at

the damages phase, since class members without rights under the TCPA would simply

not share in the damages of the class. *Id.*

In another case, the Eighth Circuit held that a class of customers with Missouri

choice-of-law clauses in their contracts was ascertainable because they could be

identified by objective criteria—specifically, the customer files of defendants. *McKeage*,

847 F.3d at 999. This was true even though applying those criteria required a tedious,

"file-by-file review process." *Id.* And whatever the process of ascertaining the class,

"[t]he precise contours of the class need not be ascertained before certification so long as

the class members can be identified at some stage of the proceeding." *In re Wholesale

Grocery Prods. Antitrust Litig.*, 2016 WL 4697338, at *5 (D. Minn. Sept. 9, 2016).

The Classes defined above are ascertainable. For each PBM, there is an objective

description of a group of identifiable individuals. The Class members are: (1) participants

in ERISA-covered health plans; (2) who paid a deductible and/or percentage coinsurance

for an EpiPen; (3) in conjunction with a claim processed through their ERISA Plan(s); and (4) in connection with which the respective PBM received from Mylan a rebate or other fee.

As in *Sandusky* and *McKeage*, the individuals satisfying these objective criteria can be identified using the PBM's records. Each PBM has already produced detailed, transaction-level claims records ("Claims Data") showing ███████████████████ ██████████████████████████████████████████ Levy Report ¶¶ 40, 44, 50, 58-61, 68, 74.[124] This Claims Data indicates ████████████ ████████████████████████████████████████. *Id.* As Plaintiffs' expert, Dr. Stephan Levy explains, this Claims Data further indicates █████ ████████████████████████████. *Id.* ¶¶ 83-92.

Each PBM also produced detailed data identifying █████████████████ ████████████████████████████ *Id.* ¶¶ 41, 45-46, 51-54, 62-63, 69. As Dr. Levy explains, the ████████████████████ ████████, *id.*, and indicates ██████████████████████████ ████, *id.* ¶¶ 93-94.

The Claims Data also provides information regarding ████████████████ *Id.* ¶¶ 76-82. From this information, Dr. Levy has devised a common, class-wide methodology

---

[124] ████████████████████████████████████████████████ ██████████████████████████████ analogous claims data may be obtained from the discrete subset of PBM clients that adjudicated such claims. If the Court certifies the Classes, Plaintiffs would seek leave to conduct limited, additional third-party discovery to obtain such claims data.

for identifying ERISA-governed plans, i.e., for identifying employer-sponsored plans and for omitting plans sponsored by governmental and certain other ERISA-exempt employers. *Id*.[125]

Accordingly, these objective data records allow for the identification of participants that satisfy the objective criteria outlined in the class definitions above.

## C. The Classes Satisfy Rule 23(a).

### 1. The Classes Are Sufficiently Numerous.

A proposed class is sufficiently numerous if "joinder of all class members is impracticable." Fed. R. Civ. P. 23(a)(1). This requirement is easily met here: Each of the Classes has tens or hundreds of thousands of members. Levy Report ¶ 96.

### 2. The Questions of Law and Fact Are Common to the Classes.

The commonality requirement is met if there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A common question is one whose determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *In re Target Corp. Customer Data Sec. Breach Litig.* ("*Target*"), 309 F.R.D. 482, 486 (D. Minn. 2015) (Magnuson, J.) (quoting *Wal–Mart Stores v. Dukes*, 564 U.S. 338 (2011)). "Even a single [common] question will do." *Dukes*, 564 U.S. at 359.

The claims against each PBM stem from a common contract—and related common, ongoing negotiations—between the PBM and Mylan that governs the rebates

---

[125] ERISA applies to plans sponsored by any employer. 29 U.S.C. § 1003(a)(1). The only employers exempt from coverage are governmental entities, churches, and certain other religious entities, *id.* § 1003(b)(1), (b)(2); 29 U.S.C. § 1002(32), (33).

and fees Mylan paid in conjunction with every EpiPen purchase by a participant in every ERISA plan served by the PBM. *See supra* pp. 16-43. *See, e.g.*, *Rozo v. Principal Life Ins. Co.*, 2017 WL 2292834, at *3 (S.D. Iowa May 12, 2017) (commonality requirement satisfied with respect to class of participants from multiple ERISA plans where defendants acted pursuant to a standardized contract applicable to every ERISA plan in the class). Each PBM engaged in common, ongoing efforts to negotiate and collaborate with Mylan to obtain greater rebates and fees, which were implemented through amendments to the common contract. *See supra* pp. 16-37. Each PBM used its broad book of business, including the ERISA Plans it served, as leverage to obtain greater rebates and fees. *See supra* pp. 38-40. And each PBM used common databases to track all rebates and fees it received with respect to every EpiPen purchased by any participant in all ERISA plans it served. *See infra* pp. 67-71.

In other words, all of the Class members' claims turn on a core of common factual issues. These common factual issues raise common legal questions regarding fiduciary status and breach, the answers to which are "apt to drive the resolution of the litigation," *Dukes*, 564 U.S. at 350. These common questions include:

(1) **Fiduciary Status:** whether each PBMs' common conduct, including its ongoing efforts to negotiate and collaborate with Mylan to obtain rebates and fees on EpiPen purchases by plan participants, constitutes discretionary control over plan "management" or "administration," 29 U.S.C. § 1002(21)(A);

(2) **Breaches of Fiduciary Duties:** whether this common conduct, which each PBM used to benefit itself and its clients to the detriment of plan participants, was contrary to ERISA's fiduciary duties of loyalty and prudence, 29 U.S.C. § 1104; and

(3) **Remedies:** what injunctive and other "appropriate equitable relief," including disgorgement and surcharge, should be imposed to "redress such violations" and prevent future violations, 29 U.S.C. § 1132(a)(3).

The answers to these questions about fiduciary status and breach will be the same for every member of each respective Class. They will be driven by the application of ERISA fiduciary law to facts that do not vary by Class member. Likewise, the evaluation of remedies will present questions about what equitable remedies are best suited to redress Defendants' common misconduct and to prevent future common misconduct. The Classes easily satisfy Rule 23(a)(2). *See also infra* pp. 61-72 (addressing the common questions in more detail within the context of Rule 23(b)(3)'s predominance requirement).

### 3. Plaintiffs' Claims Are Typical of Those of Their Respective Class(es).

The claims of a class representative must be "typical of the claims … of the class." Fed. R. Civ. P. 23(a)(3). Typicality "is fairly easily met so long as other class members have claims similar to the named plaintiff." *Postawko v. Mo. Dept. of Corr.*, 910 F.3d 1030, 1039 (8th Cir. 2018) (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995)). "Factual variations in the individual claims will not normally preclude class

certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Id*. (citing *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996)).

Each Plaintiff's claims are identical to those of their respective Class. Each PBM acted in a fiduciary capacity with respect to all participants in all of the ERISA Plans for which they provided PBM services. Each PBM owes identical duties to all participants in the ERISA Plans it serves. The common conduct described above violated those duties as to all members of the Classes or none.

Plaintiffs do not assert any claims in addition to, or different from, those of the Class. "Typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996); *accord Doran v. Mo. Dep't of Soc. Servs.*, 251 F.R.D. 401, 405 (W.D. Mo. 2008). Accordingly, Plaintiffs' claims are typical.

### 4. Plaintiffs Will Fairly and Adequately Protect the Interests of the Classes.

Rule 23(a)(4) requires inquiry into two issues: "whether the named representatives (1) have common interests with the members of the class and (2) will vigorously prosecute the interests of the class through qualified counsel." *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 613 (8th Cir. 2017), *amended*, 855 F.3d 913 (8th Cir. 2017). The key to the first part of the analysis is whether there are any "conflicts of interest between named parties and the class they seek to represent." *Id*. Here Plaintiffs have no conflicts of interest with the Class(es) they seek to represent.

They can recover only if they succeed on the legal theories that would lead to recovery for the Classes. Moreover, each Plaintiff has confirmed in a declaration that they understand the duties of a class representative and are fulfilling those duties.[126] As to the second part of the analysis, Plaintiffs have engaged counsel with extensive experience litigating complex cases generally, and ERISA actions specifically. *See infra* pp. 73-74.

**D. The Classes Satisfy the Requirements of Rule 23(b).**

In addition to the Rule 23(a) factors, Plaintiffs must also satisfy one of the three 23(b) criteria to certify a class. Plaintiffs seek certification under Rule 23(b)(1) or, in the alternative, under Rule 23(b)(3). *See DeBoer*, 64 F.3d at 1175 ("When … subsection (b)(1) … is applicable, …(b)(3) should not be used, so as to avoid unnecessary inconsistencies and compromises in future litigation.").

**1. The Classes Should be Certified Under Rule 23(b)(1)(A).**

ERISA fiduciary breach actions, like this one, are paradigmatic examples of Rule 23(b)(1) class actions. Rule 23(b)(1)(A) authorizes the use of the class action device where separate actions might "create a risk of … incompatible standards of conduct for the party opposing the class." This rule "takes in cases where the party is obliged by law to treat the members of the class alike … or where the party must treat all alike as a matter of practical necessity." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (quoting Benjamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (1)*, 81 Harv. L. Rev. 356, 388 (1967)).

---

[126] *See* Declarations of Susan Illis, Elan Klein, Adam Klein, and Emil Jalonen, submitted contemporaneously herewith.

An ERISA fiduciary is obliged to treat all participants with undivided loyalty, 29 U.S.C. § 1104(a)(1), and hence with complete impartiality. *See* John H. Langbein et al., *Pension and Employee Benefit Law* at 508-10 (6th ed. 2015) (discussing the trust law duty of impartiality carried over into ERISA). The fiduciary cannot favor one participant over another, but has a "legal duty to treat all plan members alike." 2 William B. Rubenstein, *Newberg on Class Actions* § 4:12 (5th ed. 2019). Accordingly, multiple actions challenging an ERISA fiduciary's conduct would necessarily create a risk of incompatible standards of conduct for the fiduciary, and "courts regularly certify ERISA cases under Rule 23(b)(1)(A)." *Id.* (citing numerous cases).

For example, in *Harju v. Olson*, 709 F. Supp. 2d 699 (D. Minn. 2010), the court certified a class under Rule 23(b)(1)(A) because there was "a risk that prosecution of separate actions by individual" plan participants "would result in inconsistent adjudications that would establish incompatible standards of conduct" for the defendant fiduciaries. *Id.* at 735. The issue related to whether certain accumulated hours, which could be counted towards benefit qualification under a pension plan, themselves counted as vested benefits that could not be reduced. Having previously reviewed the governing plan provisions and the plans' historical treatment of the issue, *id.* at 704-14, the court found that "separate actions could result in some courts determining that [accumulated] hours are vested benefits, and other courts determining that they are not." *Id.* at 735. "The Court's resolution of plaintiffs' claims as a class action will avoid such inconsistent results." *Id.* at 735-36.

The court in *Rozo* reached a similar conclusion. That case considered whether Principal Life, a service provider to numerous ERISA-covered retirement plans, was a fiduciary that breached its duty of loyalty with respect to its management of a common investment contract with the plans. In certifying the class under Rule 23(b)(1)(A), the court explained:

> If the class is not certified, and adjudication proceeds on an individualized basis, there is a very real risk of inconsistent judgments regarding Principal's fiduciary status and its compliance with ERISA standards, as well as the amount of money to which plan participants are entitled.

2017 WL 2292834, at *5. *See also Teets v. Great-W. Life & Annuity Ins. Co*., 315 F.R.D. 362, 373-74 (D. Colo. 2016) (finding Rule 23(b)(1)(A) satisfied in certifying a class of participants of over 13,000 distinct ERISA plans where the defendant service provider was accused of breaching its duties of loyalty in managing an investment contract common to all plans).

The rationale of these cases applies equally here. If the PBMs breached ERISA's fiduciary duties through their common contracts and ongoing efforts to negotiate and collaborate with Mylan to obtain rebates and fees, then the PBMs have a fiduciary obligation to cease this conduct as to *all* participants of *all* ERISA Plans they serve. If different courts reach differing conclusions on these issues, the PBMs will be placed in the untenable position of having to satisfy divergent standards with respect to the same conduct.

Plaintiffs acknowledge that this Court has previously held there was no "risk of … inconsistent or varying adjudications" where "all proposed class members … are seeking

the same relief." *Figas v. Wells Fargo & Co.*, 2010 WL 2943155, at *7 (D. Minn. Apr. 10, 2010) (citing *Baer v. G&T Trucking Co.*, 2005 WL 563107, at *4 (D. Minn. Mar. 1, 2005)). However, Plaintiffs respectfully submit that in this context, where the putative Classes are comprised of hundreds of thousands of ERISA Plan participants nationwide, there exists considerable risk of inconsistent or varying adjudications if absent Class members seek to vindicate their rights in future litigation (should the Classes not be certified). For one thing, although the named Plaintiffs seek the same relief, the relief sought by absent Class members in future litigation might vary. *See, e.g.*, Newberg § 4:6 ("proponents of a class under this subsection need not prove that multiple individual suits are inevitable; it is the risk that provides the basis for certification"); *Yost v. First Horizon Nat'l Corp.*, 2011 WL 2182262, at *14 (W.D. Tenn. June 3, 2011) (certifying class under Rule 23(b)(1)(A) because "[a]ny number of Plan participants have standing to file separate lawsuits against Defendants alleging breaches of fiduciary duties").

Moreover, as cases like *Harju* and *Rozo* demonstrate, there exists a risk of "inconsistent or varying adjudications" even if all absent class members in future, individual litigation sought the same relief because different courts may reach different results. For example, *Harju* noted that "separate actions could result in some courts determining that [accumulated] hours are vested benefits, and other courts determining that they are not." 709 F. Supp. 2d at 735. Likewise, in *Rozo*, although the class members all sought the same relief, it was the risk of differing judicial opinions that warranted certification.

2.  **Alternatively, the Classes Should be Certified Under Rule 23(b)(3).**

Certification is appropriate under Rule 23(b)(3) if "questions of law or fact common
to class members predominate over any questions affecting only individual members," and
"a class action is superior to other available methods for fairly and efficiently adjudicating
the controversy." Both the predominance and superiority requirements are satisfied here.

a.  **Common Issues Predominate.**

The "predominance inquiry tests whether proposed classes are sufficiently
cohesive to warrant adjudication by representation." *Amchem Prods., Inc.*, 521 U.S. at
623. "Certification is appropriate if 'the common, aggregation-enabling, issues in the case
are more prevalent or important than the non-common, aggregation-defeating, individual
issues.'" *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 374-75 (8th Cir. 2018)
(quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). "A class may
be certified based on common issues even though other important matters will have to be
tried separately, such as damages or some affirmative defenses peculiar to some
individual class members." *Id.* at 375; *see also Amgen Inc. v. Conn. Ret. Plans & Tr.
Funds*, 568 U.S. 455, 469 (2013) ("Rule 23(b)(3) … does *not* require a plaintiff seeking
class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide
proof.").

The predominance inquiry is not a merits inquiry. "Rule 23(b)(3) requires a
showing that *questions* common to the class predominate, not that those questions will be
answered, on the merits, in favor of the class." *Id.* at 459. "When determining whether
common questions predominate, the Court's 'inquiry should be limited to determining

whether, if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class.'" *Target*, 309 F.R.D. at 486 (quoting *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011)).

Plaintiffs' claims are predicated on each PBM's common, ongoing conduct to obtain rebates and fees. And the three overarching legal issues—fiduciary status, breach, and remedies—turn on the application of common ERISA principles to the common core facts. *See, e.g. Teets*, 315 F.R.D. 370-73 (class of participants in thousands of ERISA plans satisfied Rule 23(b)(3) where fiduciary status and breach were based on service provider's management of a common contract).[127] These issues are explored in more detail below.

### (i) Fiduciary Status

Congress enacted a uniform, functional definition of a "fiduciary" that is codified at 29 U.S.C. § 1002(21)(A). *See supra* p. 43. Each of the three bases for the PBMs' fiduciary status is based on application of this common definition to common facts.

*First*, the PBMs were fiduciaries because they exercised discretionary control over the conditions for EpiPen purchases to be covered by ERISA plans. *See supra* p. 44. This theory is predicated on common factual issues that will be proven through class-wide evidence, including how each PBM's common, ongoing negotiations with Mylan—and

---

[127] *See also Haddock v. Nationwide Fin. Servs., Inc.*, 293 F.R.D. 272 (D. Conn. 2013) (certifying Rule 23(b)(3) class of participants of multiple ERISA plans asserting claims against common service provider); *In re Beacon Assocs. Litig.*, 282 F.R.D. 315 (S.D.N.Y. 2012) (same); *Otte ex rel. Est. of Reynolds v. Life Ins. Co. of N. Am.*, 275 F.R.D. 50 (D. Mass. 2011) (same).

the resulting common contract—determined the rebates and fees Mylan paid in conjunction with all EpiPens purchases by participants in all ERISA plans served by the PBM. This theory presents common legal questions, including whether a service provider's exercise of discretion over the conditions under which drugs will be covered under an ERISA plan constitutes plan "management" or "administration" within the meaning of 29 U.S.C. § 1002(21)(A).

*Second*, the PBMs were fiduciaries because they exercised ongoing, discretionary control over the amounts participants must pay in cost-sharing payments in order to purchase EpiPens with coverage under their ERISA plans. *See supra* p. 44. This theory presents common factual issues that can be answered with class-wide evidence, including (i) how the PBMs' common efforts to obtain rebates and fees increased the EpiPen list price and, with it, participant cost-sharing payments; and (ii) how the PBMs failed to use the rebates and fees they received to benefit participants, including by providing direct price relief to participants at the point of sale. This theory presents the common legal question of whether discretionary control over the amounts of cost-sharing payments paid by participants for prescription drugs covered by ERISA plans constitutes plan "management" or "administration."

*Third*, the PBMs were fiduciaries because they exercised discretionary control over the amounts of compensation they received from Mylan by virtue of their positions as service providers to ERISA plans. *See supra* p. 45. This theory presents common factual issues that can be answered with class-wide evidence. For example, each PBM negotiated and collaborated with Mylan to obtain increasing rebates and fees, including

by leveraging their relationships with all the plans it served to obtain greater rebates and

fees. These rebates and fees were formalized in a single, common contract, and common

amendments thereto, that covered all EpiPen purchases by the participants in all ERISA

plans served by the PBM. This theory raises the common legal question of whether each

PBM had "control over factors that determine the actual amount of its compensation"

such that it qualifies as an ERISA fiduciary. *See, e.g.*, *F.H. Krear & Co.*, 810 F.2d at

1259; *Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 722 F.3d 861,

867 (6th Cir. 2013); *Abraha v. Colonial Parking, Inc*., 243 F. Supp. 3d 179, 186 (D.D.C.

2017) (collecting cases).

    None of these bases for fiduciary status turns on individual or even plan-level

issues. Contrary to Defendants' suggestions in their motion to dismiss briefing, *see* ECF

No. 214 at 27-37, the terms of contracts between the PBMs and the thousands of

employers or insurance companies that sponsor, insure, or administer the plans served by

the PBMs are irrelevant to the Classes' claims. Regardless of whether the PBMs were

*granted* authority by each client to engage in the conduct at issue, fiduciary status here is

based on the *exercise* of fiduciary control and authority. *See, e.g.*, *Olson v. E.F. Hutton &

Co.*, 957 F.2d 622, 625 (8th Cir. 1992) (ERISA's functional fiduciary test "impose[s]

fiduciary status on those who exercise discretionary authority, regardless of whether such

authority was ever granted"). As demonstrated above, each PBM explicitly exercised

authority and control with respect to every Class member's ERISA plan, including by

executing a contract with Mylan, and ongoing amendments thereto, that expressly and

exclusively governs the rebates and fees Mylan must pay as a condition for EpiPens to be

purchased by plan participants. This Court's ultimate determination of fiduciary status will apply to all participants in each Class uniformly.

### (ii) Breach of Fiduciary Duties

Congress enacted uniform fiduciary duties that apply to all ERISA fiduciaries, including the duties of loyalty and prudence. *See supra* pp. 45-56 (citing 29 U.S.C. § 1104(a)(1)). The PBMs' common conduct with respect to rebates and fees presents a multitude of factual and legal questions, all of which are common to each Class, including whether a loyal and prudent fiduciary in the position of the PBMs would have:

(1) used its position as a plan benefit manager to negotiate and collaborate with Mylan to obtain, for its *own* benefit, rebates and fees paid on EpiPens purchased by plan participants;

(2) negotiated and contracted for rebates or fees, even if such rebates and fees were shared with its *clients*, because it would have known those rebates and fees increased the EpiPen list price and, with it, *participants'* out-of-pocket payments;

(3) leveraged its relationships with all the plans it served to obtain greater rebates and fees;

(4) failed to use the rebates and fees it did receive to lower the costs paid by participants, including through point-of-sale rebate sharing programs;

(5) set its compensation as a percentage of a drug's price, knowing that it would establish a conflict of interest between participants' interest in low drug prices and its own interest in higher compensation;

(6) failed to take any reasonable efforts to negotiate a *lower* list price in lieu of rebates and fees; and

(7) failed to disclose to participants material information about their benefits, including the amounts of rebates and fees and the impact of such rebates and fees on participants' out-of-pocket payments for EpiPens.

As with respect to fiduciary status, the answers to these questions will not vary based on individual or plan-specific circumstances. In particular, although the PBMs have argued that they shared some of the rebates or fees with clients, purportedly for the purpose of lowering net costs *to such clients*, *e.g.,* ECF No. 215 at 3, 5, ERISA's duty of loyalty is owed "solely" to plan *participants*, 29 U.S.C. § 1104(a)(1), who did not benefit from the "net price" and instead made payments derived from the inflated list price.

### (iii)  Remedies

The law governing ERISA remedies is also uniform. ERISA provides that participants and beneficiaries in ERISA Plans may file suit "to enjoin any act or practice which violates" ERISA and "to obtain any other appropriate equitable relief … to redress such violations." 29 U.S.C. § 1132(a)(3).[128]

---

[128] "Appropriate equitable relief" includes those remedies that were "typically available" in historical courts of equity. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255-56 (1993).

**Forms of Remedies:** Plaintiffs seek injunctive relief to prohibit the PBMs' breaches in the future, as well as monetary equitable relief in the form of disgorgement and surcharge.[129] *See supra* p. 47. Disgorgement requires "a defendant who owes a fiduciary duty to a plaintiff" to "disgorge any profits made by breaching that duty." *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1008-09 (8th Cir. 2004). It is a well-recognized equitable, monetary remedy available under ERISA. *Id.* As the Eighth Circuit explained in *Parke,* after a court concludes that a defendant "owed a fiduciary duty to [the plaintiff] and that it breached that duty," it "can be forced under [29 U.S.C.] § 1132(a)(3)(B) to disgorge any profits earned as a result of that conduct." *Id.* at 1009.

Equitable surcharge, on the other hand, measures not the gain to the defendant, but the individual loss to the participant resulting from the fiduciary breach. It is a well-recognized, equitable "make-whole" remedy applicable in ERISA fiduciary breach cases. *Amara*, 563 U.S. at 441-42; *accord Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 721-22, 724-25 (8th Cir. 2014) (surcharge available under 29 U.S.C. § 1132(a)(3)).

The availability and lineaments of these remedies do not depend on any conduct by Class Members or any plan-specific circumstances.

**Common Calculations of Monetary Relief:** The Supreme Court recently reiterated that a need to individually calculate damages does not preclude class

---

[129] "[T]he fact that ... relief takes the form of a money payment does not remove it from the category of traditionally equitable relief." *CIGNA Corp. v. Amara*, 563 U.S. 421, 441-42 (2011) ("Equity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment.").

certification under Rule 23(b)(3). *Tyson Foods*, 136 S. Ct. at 1045. *See also Target*, 309

F.R.D. at 489. Nonetheless, calculations of monetary relief in this case further support the

predominance of common questions because they may be determined pursuant to

common models that measure Defendants' profits, or the Class members' losses,

"attributable to" the theories of liability set forth above. *Comcast Corp. v. Behrend*, 569

U.S. 27, 35 (2013) ("any model supporting a 'plaintiff's damages case must be consistent

with its liability case'").

  **Disgorgement**: The amount of each PBM's disgorgement liability will be

determined in the aggregate, using a common formula and common data sets. *See, e.g.*, *In*

*re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009)

("The use of aggregate damages calculations is well established in federal court and

implied by the very existence of the class action mechanism itself."); *see also* Newberg §

12.2. As Dr. Levy explains in his report, each PBM has produced data ███████████

████████████████████████████████████████████████. Levy Report ¶¶

40, 44, 50, 58-61, 68, 74, 101-102.[130] ████████████████████████████

---

[130] Prime has refused to produce data reflecting rebates and fees collected from Mylan prior to 2012, claiming it is not reasonably accessible. Although Plaintiffs reserve their rights to further pursue this data, Dr. Levy has proposed alternative means, using evidence common across the Prime Class, of calculating the amount of rebates Prime obtained during this earlier time period. Levy Report ¶ 69 n.56. *See also Greater St. Louis Constr. Laborers Welfare Fund v. D&H Concrete, Inc.*, 2008 WL 2437419, at *2 (E.D. Mo. June 12, 2008) ("The imprecision of this [measure of ERISA damages] was necessitated by the defendants' failure to provide the information requested by plaintiffs. … [A] defendant 'will not [be] permit[ted] to reduce its liability by alluding to inaccuracies when the fault for the inaccuracies lies squarely in the defendant's lap.").



██████████████████████████████████████████████████████████. *Id.* ¶¶ 76-82, 102.

As Dr. Levy further explains, ████████████████████████████████████████

███████████████████████████████████████ *Id.* ¶¶ 42, 47, 51-56, 62-66, 70,

103.[131]

Dr. Levy's disgorgement methodology would add ███████████████████

████████████████████████████████████████████████ and ███████

████████████████████████████████████████[132] *Id.* ¶¶ 102-03.

The net amount of rebates and fees retained by each PBM would represent the total

benefit to the PBM that is "attributable to" its common efforts to negotiate and

collaborate with Mylan to obtain rebates and fees on EpiPen purchases by participants in

the ERISA plans it served. The resulting amount would then be allocated equitably to

members of the respective Class. *Id.* ¶ 105.

**Surcharge:** Although calculations of each Class member's surcharge remedy will

entail the use of certain transaction-level inputs, those inputs are derived from common

data sets that have been, or can be, produced in discovery. As Dr. Levy explains, each

PBM has produced detailed, ██████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

---

[131] Plaintiffs will continue to confer with certain defendants that have raised, in recent correspondence, concerns about the completeness of some subsets of their data reflecting rebates shared with clients.

[132] Monies shared between or among OptumRx and UnitedHealth would not be subtracted from the collective amount to be disgorged by OptumRx and UnitedHealth.

. *See supra* pp. 68-69, *see also* Levy Report ¶ 107.

Dr. Levy details how calculating each Class member's monetary recovery can be performed by inputting these data points into a common, formulaic methodology. Levy Report ¶¶ 109-113. As *Newberg* explains, the use of common formulaic calculations based on defendants' records is the gold standard for calculating individual damages in Rule 23(b)(3) cases:

> In general, formulae based on records tend to be simple and mechanical such that if properly designed, courts will rarely deny certification, as individual questions of damage will not overwhelm class damage issues. The Supreme Court's decision in *Comcast* has not altered this analysis, assuming, of course, the damage model tracks the liability model. Even in instances in which the defendant's records cannot lead to exact calculations, they often form a rubric or data point that a formula can use.

Newberg § 12:5. *See also Day v. Celadon Trucking Servs.*, 827 F.3d 817, 833-34 (8th Cir. 2016) (WARN Act case certified under Rule 23(b)(3) where liability issues were common and damages for each individual worker were calculated pursuant to a common formula using individual-level employment records).

Dr. Levy's common surcharge methodology entails the following steps: (1)

███████████████████████████████████████████████

█████████. Levy Report ¶¶ 109-48.

Dr. Levy's surcharge methodology thus provides a precise measurement of what each Class member would have paid had they received the benefit of the rebates and fees their PBM obtained from Mylan on their EpiPen purchases, in breach of ERISA's fiduciary duties. Accordingly, it too satisfies *Comcast's* requirement that a common methodology measure losses "attributable" to each PBM's fiduciary breaches.

**Precision Is Not Required:** With respect to either method of calculating monetary relief, three related principles are worth noting. First, as the Supreme Court recognized in *Comcast*, common formulas for calculating class remedies "need not be exact." 569 U.S. at 35. This is, of course, consistent with the general principle that, in proving damages, "it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Martin v. Feilen*, 965 F.2d 660, 671-72 (8th Cir. 1992) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)). Second, in ERISA cases in which a defendant is proven to have breached its fiduciary duties, the plaintiffs need only offer "a prima facie case of loss … or ill-gotten profit," after which "the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach of duty." *Id.* at 671. Third, where a fiduciary is found to have breached its fiduciary duties, any "ambiguities in determining loss" are "resolve[d] against the [fiduciary] in breach." *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 602 (8th Cir. 1995). *Accord Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("once

a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer").

Because, at the very least, Dr. Levy's methodologies provide "just and reasonable" approximations of the total profit the PBMs obtained through their common fiduciary breaches and the amounts each participant would have paid had they received the benefit of the rebates and fees their PBM wrongly obtained from Mylan, these methodologies satisfy *Comcast's* requirement that a common formula measure profits and losses "attributable" to the alleged misconduct. And because, as addressed above, the PBM data makes it possible to perform these calculations mechanically, practically at the flip of a switch, there will be no need for individual damages hearings. Thus, even with respect to calculating monetary relief, individual issues do not predominate over the common issues; and any such individual issues certainly do not predominate over all of the common issues presented by this case, including those regarding fiduciary status and breach.

### b.  A Class Action Is Superior to Other Available Methods of Adjudication.

Rule 23(b)(3) sets out four non-exclusive factors for determining whether a class action is the superior method of resolving a controversy: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

All of these factors confirm that a class action is superior to other available methods to resolve this controversy. First, as this Court noted in *Gregory v. EBF & Associates, L.P.*, 2010 WL 11537515 (D. Minn. May 7, 2010), "class members have little interest in controlling the litigation or instituting their own claims" where "the recoverable damages, if any, would likely not be sufficient to cover the cost of litigating their claims individually." *Id.* at *2. Here, although members of the class paid tens or hundreds of dollars more than they should have for EpiPens, the amount any class member overpaid is insufficient to cover the cost of litigating claims individually. Second, all lawsuits asserting ERISA breach of fiduciary duty claims against these Defendants for EpiPen-related rebate and fee conduct have been consolidated before this Court. ECF No. 181. Third, as in *Gregory*, the "concentration of all class members' claims in one forum appears desirable, given this may be the only feasible manner for recovery by" the plan participants. 2010 WL 11537515, at *2. Finally, in *Gregory*, as here, the Class members may be identified, and the value of their claims computed, through records of the Defendants. *Id.*

## VI.   CLASS COUNSEL

Courts are required to separately consider the adequacy of counsel under Fed. R. Civ. P. 23(g). Plaintiffs respectfully request the Court approve a class counsel leadership structure composed of Cari C. Laufenberg of Keller Rohrback L.L.P. as Lead Class Counsel; Kate M. Baxter-Kauf of Lockridge Grindal Nauen PLLP as Class Liaison Counsel; and the following Co-Class Counsel, who will be members of the Plaintiffs' Steering Committee: (a) Stuart A. Davidson of Robbins Geller Rudman & Dowd LLP;

(b) Kathleen M. Donovan-Maher of Berman Tabacco; (c) Rex A. Sharp, of Rex A. Sharp, P.A.; (d) Warren T. Burns of Burns Charest LLP; (e) William Mark Lanier of The Lanier Law Firm, PLLC; and (f) Anthony F. Maul of The Maul Firm PC. As detailed in the declarations of counsel,[133] all of the factors enumerated in Rule 23(g)(1) weigh in favor of approving this leadership structure.

First, the above listed counsel did significant work to identify and investigate potential claims in this action.[134] Fed. R. Civ. P. 23(g)(1)(A)(i). Second, the above listed counsel have extensive experience handling class actions and complex litigation generally, and complex ERISA litigation specifically, and are willing and able to commit the necessary resources to achieving a successful outcome in this case.[135] Fed. R. Civ. P. 23(g)(1)(A)(ii)-(iv). Proposed Lead Class Counsel, Cari C. Laufenberg of Keller Rohrback L.L.P., has served in court-appointed leadership roles in multiple consumer cases, and has fulfilled primary roles in several ERISA breach-of-fiduciary-duty cases. *See* Laufenberg Decl. ¶¶ 7-13. Counsel have already done substantial work in the case, including successfully resisting Defendants' motions to dismiss and engaging in extensive document discovery from all four sets of Defendants.[136] *See* Fed. R. Civ. P.

---

[133] *See* Declaration of Cari Campen Laufenberg in Support of Plaintiffs' Motion for Class Certification ("Laufenberg Decl."), submitted contemporaneously herewith; *see also* Declarations of Kate M. Baxter-Kauf, Stuart A. Davidson, Kathleen M. Donovan-Maher, Rex A. Sharp, Warren T. Burns, William Mark Lanier, and Anthony F. Maul (collectively, "Co-Class Counsel Declarations"), submitted contemporaneously herewith.

[134] *See, e.g.*,  Laufenberg Decl. ¶ 20.

[135] *See* Laufenberg Decl. ¶¶ 7-13; Co-Class Counsel Declarations.

[136] *See, e.g.*, Laufenberg Decl. ¶ 21.

23(g)(B) (court may consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interest of the class").

Thus, Plaintiffs' counsel will adequately represent the Classes pursuant to Rule 23(g).

## VII.   CONCLUSION

Plaintiffs respectfully request that the Court certify each of the four Classes defined above. Each Class is ascertainable and satisfies the requirements of Rule 23(a). Each Class also satisfies the requirements of Rule 23(b)(1)(A), or, in the alternative, Rule 23(b)(3). Plaintiffs further request that the court approve the proposed class counsel leadership structure, which satisfies the requirements of Rule 23(g).

Dated December 16, 2019                    Respectfully submitted,

**KELLER ROHRBACK L.L.P.**

*/s/ Cari Campen Laufenberg*
Cari Campen Laufenberg (*Pro Hac Vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Email: claufenberg@kellerrohrback.com

***Proposed Lead Class Counsel***

Gretchen S. Obrist (*Pro Hac Vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Email: gobrist@kellerrohrback.com

***Plaintiffs' Interim Lead Class Counsel***

Lynn Lincoln Sarko (*Pro Hac Vice*)
Gretchen Freeman Cappio (*Pro Hac Vice*)
Matthew Gerend (*Pro Hac Vice*)
Garrett Heilman (*Pro Hac Vice*)

1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Email: lsarko@kellerrohrback.com
         gcappio@kellerrohrback.com
         mgerend@kellerrohrback.com
         gheilman@kellerrohrback.com

**LOCKRIDGE GRINDAL NAUEN PLLP**

Kate M. Baxter-Kauf, MN #392037
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 596-4007
Email: kmbaxter-kauf@locklaw.com

***Plaintiffs' Interim Liaison Counsel***

Karen Hanson Riebel, MN #219770
David W. Asp, MN #344850
Kristen G. Marttila, MN #346007
Arielle S. Wagner, MN #398332
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Email: khriebel@locklaw.com
         dwasp@locklaw.com
         kgmarttila@locklaw.com
         aswagner@locklaw.com

**ROBBINS GELLER RUDMAN & DOWD LLP**

Stuart A. Davidson (*Pro Hac Vice*)
120 East Palmetto Park Road
Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000

Email: sdavidson@rgrdlaw.com

***Plaintiffs' Interim Steering Committee***

Paul J. Geller (*Pro Hac Vice*)
Christopher Gold (*Pro Hac Vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Email: pgeller@rgrdlaw.com
         cgold@rgrdlaw.com

Brian O. O'Mara (*Pro Hac Vice*)
Arthur L. Shingler, III (*Pro Hac Vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Email: bomara@rgrdlaw.com
         ashingler@rgrdlaw.com

**BERMAN TABACCO**

Kathleen M. Donovan-Maher (*Pro Hac Vice*)
1 Liberty Square, 8th Floor
Boston, MA 02109
Telephone: (617) 542-8300
Email: kdonovanmaher@bermantabacco.com

***Plaintiffs' Interim Steering Committee***

Justin N. Saif (*Pro Hac Vice*)
Steven L. Groopman (*Pro Hac Vice*)
Marc J. Greenspon (*Pro Hac Vice*)
1 Liberty Square, 8th Floor
Boston, MA 02109
Telephone: (617) 542-8300
Email: jsaif@bermantabacco.com
         sgroopman@bermantabacco.com
         mgreenspon@bermantabacco.com

Christopher Heffelfinger (*Pro Hac Vice*)
44 Montgomery Street, Suite 650

San Francisco, CA 94104
Telephone: (415) 433-3200
Email: cheffelfinger@bermantabacco.com

**REX A. SHARP, P.A.**

Rex A. Sharp (*Pro Hac Vice*)
5301 W. 75th Street
Prairie Village, KS 66208
Telephone: (913) 901-0505
Email: rsharp@midwest-law.com

*Plaintiffs' Interim Steering Committee*

**BURNS CHAREST LLP**

Warren T. Burns (*Pro Hac Vice*)
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
Email: wburns@burnscharest.com

*Plaintiffs' Interim Steering Committee*

**THE LANIER LAW FIRM, PLLC**

William Mark Lanier (*Pro Hac Vice*)
6810 F.M. 1960 West
Houston, TX 77069
Telephone: (713) 659-5200
Email: wml@lanierlawfirm.com

*Plaintiffs' Interim Steering Committee*

**THE MAUL FIRM PC**

Anthony F. Maul (*Pro Hac Vice*)
68 Jay Street, Suite 201
Brooklyn, NY 11201
Telephone: (718) 395-4918
Email: afmaul@maulfirm.com

*Plaintiffs' Interim Steering Committee*